JOSEPH FLEMING AND WILLIAM A. MARSHALL, TRADING UNDER THE FIRM OF FLEMING & MARSHALL, *v.* JAMES PAGE, COLLECTOR OF THE UNITED STATES.

During the war between the United States and Mexico, the port of Tampico, in the Mexican State of Tamaulipas, was conquered, and possession of it held by the military authorities of the United States, acting under the orders of the President.

The President acted as a military commander prosecuting a war waged against a public enemy by the authority of his government, and the conquered country was held in possession in order to distress and harass the enemy.

It did not thereby become a part of the Union. The boundaries of the United States were not extended by the conquest.

Tampico was, therefore, a foreign port, within the meaning of the act of Congress passed on the 30th of July, 1846, and duties were properly levied upon goods imported into the United States from Tampico.

The administrative departments of the government have never recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by an act of Congress; and the principle thus adopted has always been sanctioned by the Circuit Courts of the United States, and by this court.

THIS case came up from the Circuit Court of the United States for the Eastern District of Pennsylvania, on a certificate of division in opinion between the judges thereof.

It was an action brought by Fleming and Marshall against Page, collector of the port of Philadelphia, in one of the State courts of Pennsylvania, in 1847, to recover back certain duties on goods, wares, and merchandise, imported into the port of Philadelphia from Tampico, in Mexico, in March and June of that year. The case was afterwards, in 1848, taken into the Circuit Court of the United States for the Eastern District of Pennsylvania, and was tried May term, 1849, when the jury found for the plaintiffs. A motion was thereafter made, on

behalf of the United States, to set aside the verdict, and for a new trial on the grounds, —

 1st. That the learned judge erred in charging the jury that, in the year 1847, Tampico was not a portion of a foreign country within the meaning of the first section of the act of Congress of the United States passed 30th July, 1846, entitled " An act reducing the duties on imports, and for other purposes."

 2d. That the learned judge erred in charging the jury that, in the year 1847, Tampico was so far under the dominion of the United States, that goods, wares, and merchandise imported from that port into Philadelphia, in March and June of that year, were not subject to the payment of duties.

 3d. That the learned judge erred in charging the jury that, upon the facts in evidence, the plaintiffs were entitled to a verdict for the amount of duties paid under protest on the 15th of June, 1847, on merchandise imported in the schooner Catharine, from Tampico, into the port of Philadelphia, in March and June, 1847.

 And the following case was stated for the opinion of the court : —

### " FLEMING AND MARSHALL *v.* PAGE.

 " This action is brought by the plaintiffs, merchants, residing in the city of Philadelphia, against the defendant, the late collector of the port of Philadelphia, to recover the sum of one thousand five hundred and twenty-nine dollars, duties paid on the 14th of June, 1847, under protest, on goods belonging to the plaintiffs, brought from Tampico while that place was in the military occupation of the forces of the United States.

 " On the 13th of May, 1846, the Congress of the United States declared that war existed with Mexico. In the summer of that year, New Mexico and California were subdued by the American armies, and military occupation taken of them, which continued until the treaty of peace of May, 1848.

 " On the 15th of November, 1846, Commodore Conner took military possession of Tampico, a seaport of the State of Tamaulipas, and from that time until the treaty of peace it was garrisoned by American forces, and remained in their military occupation. Justice was administered there by courts appointed under the military authority, and a custom-house was established there, and a collector appointed, under the military and naval authority.

 " On the 29th of December, 1846, military possession was taken by the United States of Victoria, the capital of Tamauli-

pas; garrisons were established by the Americans at various posts in that State; and, at the period of the voyages from Tampico of the schooner Catharine, hereinafter mentioned, Tamaulipas was reduced to military subjection by the forces of the United States, and so continued until the treaty of peace.

"On the 19th of December, 1846, the schooner Catharine, an American vessel chartered by the plaintiffs, cleared coastwise from Philadelphia for Tampico.

"On the 13th of February, 1847, she was cleared at the custom-house at Tampico, on her return voyage to Philadelphia, under a coasting manifest, signed by Franklin Chase, United States acting collector.

"The Catharine brought back a cargo of hides, fustic, sarsaparilla, vanilla, and jalap, the property of the plaintiffs, which was admitted into the port of Philadelphia free of duty. The Catharine cleared again coastwise from Philadelphia for Tampico, on the 18th of March, 1847, and in June, 1847, brought back a return cargo of similar merchandise, owned by the plaintiffs, which the defendant, acting under the instructions of the Secretary of the Treasury, refused to admit, unless the duties on the merchandise brought by the Catharine on her former voyage were paid, as well as the duties on the goods brought by her on this voyage.

"Thereupon, the plaintiffs, on the 14th of June, 1847, paid under protest the duties on both voyages, amounting to $1,529, and brought this action to recover back the money so paid.

"The question for the decision of the court is, whether the goods so imported by the Catharine were liable to duty. If the court are of opinion that they were not so liable, then judgment is to be entered for the plaintiffs, for the sum of $1,529, with interest from the 14th of June, 1847.

"If they are of opinion that they were liable to duty, then judgment is to be entered for the defendant.

"It is agreed, 'that all instructions from the several departments of the government to any of its officers, and all documents of a public nature, touching the war with Mexico or our relations with that country, which either party may desire to bring to the attention of the court, shall be considered as if made part of this case.'

> "McCall, *for Plaintiffs.*
> Ashmead, *for Defendant.*"

The cause having come on to be argued on the case stated, the judges of the Circuit Court were opposed in opinion on the following point: —

" Whether Tampico, in the year 1847, while in the military occupation of the forces of the United States, ceased to be a foreign country, within the meaning of the first section of the act of Congress passed 30th July, 1846, entitled, ' An act reducing the duty on imports, and for other purposes '; so that goods, wares, and merchandise of the produce, growth, and manufacture of Mexico, or any part thereof, imported into the port of Philadelphia from Tampico, during said military occupation, were not subject to the payment of the duties prescribed by the said act, but entitled to be entered free of duty as from a domestic port."

The first section of the act of 30th July, 1846, above referred to, is as follows : —

" That from and after the first day of December next, in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, and on such as may now be exempt from duty, there shall be levied, collected, and paid, on the goods, wares, and merchandise herein enumerated and provided for, imported from foreign countries, the following rates of duty," &c. Session Laws, Statutes at Large, 42.

Upon the above certificate of division in opinion, the case came up to this court.

It was argued by *Mr. McCall* and *Mr. Webster*, for the plaintiffs, and by *Mr. Johnson* (Attorney-General), for the defendant.

*Mr. McCall*, for the plaintiffs, contended, that Tampico, at the time of the shipment of the goods, being in the firm possession of the United States by conquest and military occupation, was not a foreign country within the meaning of the act of July 30, 1846, and, consequently, that the goods brought in the Catharine were not liable to duty.

The act of July 30, 1846, reducing the duty on imports and for other purposes, provides that there shall be collected on the goods, wares, and merchandise therein enumerated, imported from foreign countries, certain rates of duty.

The first question, then, is, What is a foreign country, within the meaning of the revenue laws ?

A foreign country is one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States. This is the well-settled meaning of the word " foreign," in acts of Congress. 1 Gall. 58, 55 ; 1 Story, 1.; 2 Gall. 4, 485 ; 1 Brock. 241 ; 4 Wheat. 254.

If, then, Tampico, during its occupation by the forces of the

United States, was not exclusively within the sovereignty of Mexico, it follows that it was not a foreign country, and consequently the goods brought from it were not liable to duty.

Tampico, during its military occupation by our forces, was under the sovereignty and within the jurisdiction of the United States.    The sovereignty of Mexico over it was superseded by that of the United States.

This change of sovereignty, as a consequence of firm military occupation, is as settled as any other principle of the law of nations, and has been repeatedly recognized by the highest authority in this country.    United States v. Rice, 4 Wheat. 246.

It might suffice to refer simply to the case of Castine, which contains a lucid exposition of the law of nations on the point in question, and is conceived to be decisive of the present case. It is proposed, however, to bring to the attention of the court some additional authorities on the subject of the legal effect of the capture and firm possession — such as existed in the case of Tampico and the State of Tamaulipas — of a portion of an enemy's territory.

The result of the authorities may be briefly stated as follows.    The duty of allegiance is reciprocal to the duty of protection.    When, therefore, a nation is unable to protect a portion of its territory from the superior force of an enemy, it loses its claim to the allegiance of those whom it fails to protect, and the conquered inhabitants pass under a temporary allegiance to the conqueror, and are bound by such laws, and such only, as he may choose to impose.    The sovereignty of the nation which is thus unable to protect its territory is displaced, and that of the successful conqueror is substituted in its stead.

The jurisdiction of the conqueror is complete.    He may change the form of government and the laws at his pleasure, and may exercise every attribute of sovereignty.    The conquered territory becomes a part of the domain of the conqueror, subject to the right of the nation to which it belonged to recapture it if they can.    By reason of this right to recapture, the title of the conqueror is not perfect until confirmed by treaty of peace.    But this imperfection in his title is, practically speaking, important only in case of alienation made by the conqueror before treaty.    If he sells, he sells subject to the right of recapture.

But although, for purposes of sale, the title of the conqueror is imperfect before cession, for purposes of government and jurisdiction his title is perfect before cession.    As long as he retains possession he is sovereign; and not the less sovereign because his sovereignty may not endure for ever.

Grotius (ch. 6, book 3, § 4), speaking of the right to things taken in war, says that land is reputed lost which is so secured by fortifications that without their being forced it cannot be repossessed by the first owner. And in ch. 8, book 3, treating of empire over the conquered, he shows that sovereignty may be acquired by conquest.

Wolffius, in his treatise De Jure Gentium (ch. 7, De Jure Gentium in Bello, § 863), states the doctrine very strongly.

Puffendorf, book 8, ch. 11, title "How Subjection ceases"; same author, Treatise on the Duties of the Man and the Citizen, book 2, ch. 10, § 2; Bynkershoek on the Law of War, Duponceau's translation, 124; 2 Burlamaqui, 74; Vattel, book 3, ch. 13, and book 1, ch. 17; Martens on the Law of Nations, book 8, ch. 3, § 8; Wheaton, Elements of International Law, p. 440; 7 Co. 17, b; Dyer, 224, a, pl. 29; 2 P. Wms. 75; Cowper, 204; Dodson, 450; 2 Hagg. Consistory Rep. 371; 9 Cranch, 191; 7 Peters, 86; 2 Gall. 485; 4 Wheat. 246; 1 Opinions of Attorney-General, 119.

These authorities seem to establish conclusively, —

1st. That, by conquest and firm military occupation of a portion of an enemy's country, the sovereignty of the nation to which the conquered territory belongs is subverted, and the sovereignty of the conqueror is substituted in its place.

2d. That although this sovereignty, until cession by treaty, is subject to be ousted by the enemy, and therefore does not give an indefeasible title for purposes of alienation, yet while it exists it is supreme, and confers jurisdiction without limit over the conquered territory, and the right to allegiance in return for protection.

It follows that Tampico, while in the military possession of our forces, passed from the sovereignty of Mexico to the sovereignty of the United States, and was subject in the fullest manner to the jurisdiction of the United States, and therefore could in no correct sense be said to be foreign to the United States.

It cannot be denied that these principles, established by the common consent of the civilized world, must govern the title to conquests made by the United States. As one of the family of nations, they are bound by the law of nations, and the nature and effect of their acquisitions by conquest must be defined and regulated by that law.

That the United States may acquire territory by conquest results from their power to make war. They cannot in this respect be less competent than all the other nations of the world. The right to acquire by conquest is an inseparable incident to the right to maintain war.

Mr. Justice Story, in the third volume of his Commentaries on the Constitution, says, at p. 160: — " The Constitution confers on the government of the Union the power of making war and of making treaties; and it seems consequently to possess the power of acquiring territory either by conquest or treaty."

And at p. 193: — " As the general government possesses the right to acquire territory, either by conquest or treaty, it would seem to follow as an inevitable consequence that it possesses the power to govern what it has so acquired."

Chief Justice Marshall, in the Am. Ins. Co. *v.* Canter, 1 Peters, 542, treats it as clear. " The Constitution," says he, " confers absolutely on the government of the Union the powers of making war and of making treaties; consequently, that government possesses the power of acquiring territory either by conquest or treaty."

The messages of the President to Congress during the war, and the instructions from the heads of departments, contain authoritative declarations as to the right of the United States to acquire foreign territory by conquest, and as to the effect of such conquest upon the sovereignty of the conquered territory, in accordance with the principles above stated. Thus, the President, in his message of December, 1846, says: — " By the law of nations a conquered territory is subject to be governed by the conqueror during his military possession, and until there is either a treaty of peace or he shall voluntarily withdraw from it. The old civil government being necessarily superseded, it is the right and duty of the conqueror to secure his conquest, and to provide for the maintenance of civil order and the rights of the inhabitants. This right has been exercised and this duty performed by our military and naval commanders, by the establishment of temporary governments in some of the conquered provinces in Mexico, assimilating them as far as practicable to the free institutions of our own country."

See also the message of 7th December, 1847.

The instructions from the Secretary of War to General Kearney, commanding the expedition to New Mexico and California, dated June 3, 1846, (House Doc. No. 60, 1st Sess. 30th Congress, p. 153,) which were transmitted to General Taylor, with liberty to observe the same course of conduct in the departments that might be conquered by him, provide for the establishment of temporary civil governments, recommend the employment of such of the existing civil officers as were known to be friendly to the United States, and would take the oath of allegiance to them, and authorize him to assure the people of those provinces of the wish and design of the United States to

provide for them a free government, with the least possible delay, similar to that which exists in our territories.

See also the instructions of the Secretary of the Navy to the officers commanding the naval forces in the Pacific.

Reference is also made to the circular from the Treasury Department to collectors and other officers of the customs, which contains the following clause: — " Foreign imports, which may be reëxported in our vessels to Matamoras, will not be entitled to any drawback of duty; for if this were permitted, they would be carried from that port into the United States, and thus evade the payment of all duties.  Whenever any other port or place upon the Mexican side of the Rio Grande shall have passed into the actual possession of the forces of the United States, such ports and places will be subject to all the above instructions which are applicable to the port of Matamoras."

*Mr. Johnson,* for the defendant, Page, contended that Tampico, in the year 1847, although in the military occupation of the forces of the United States, was a foreign country within the meaning of the first section of the Revenue Act of 30th July, 1846; and therefore plaintiffs below were not entitled to recover back the duties paid by them.

*Mr. Johnson* said that the President, in the exercise of his constitutional power as commander-in-chief of the army, determined that the war must support itself as far as practicable; that Mexico must be made to furnish contributions in every way.  The operations of the army were therefore continued until it conquered as much territory as originally belonged to the old thirteen States, and the capital of the enemy fell into its hands.  Our flag covered all this country, and if the argument on the other side is sound, every port in Mexico became a domestic port of the United States.  The government may acquire territory under the war power and by conquest; also, under the treaty-making power; and under either it is as much the property of the United States as the territory which belonged to us at the adoption of the Constitution.  But with this admission we must stop.  The President is not the government.  The argument on the other side implies that the President can acquire whatever territory he chooses.  The error is in supposing that an analogy exists between our government and that of England.  The power to declare war is differently placed.  The counsel says that the power to declare war carries with it a right to conquer the country of the enemy.  But Congress alone has the power to declare war, and

the President is only the agent of Congress in carrying it on. Sir William Scott and Lord Mansfield may be right when they say, that, instantly upon the conquest of a country, the laws of England are extended over it. But it is not so with us.

The cases cited say that the conqueror becomes proprietor. But our Constitution says that Congress has the power to make rules for the government of territories. If the argument on the other side be sound, it must be the President who has this power. The true view of the subject is, that the President, or rather the United States, had only a *quasi* ownership of the conquered country. We held it by a military title only. The treaty with Mexico recognized this as Mexican country. When she regained it, her title did not accrue under the treaty with us, but the original sovereignty was reëstablished. Our claim to California does not rest on conquest, but on the subsequent treaty. Instead of the extension of our laws over the acquired territory being the result of mere conquest, as in England, the President recommended that Congress should pass an act for this special purpose.

*Mr. Johnson* then referred to and commented upon the following authorities and documents.

The Foltina, 1 Dodson, 450; Campbell *v.* Hall, 1 Cowper, 204; Thirty hhds. of Sugar, 9 Cranch, 191; United States *v.* Rice, 4 Wheat. 246; 1 Black. Com. 257.

Act of March 1, 1817, "An act concerning the navigation of the United States." 3 Stat. at Large, 351.

Circular of Mr. Crawford, Secretary of the Treasury, of 29th September, 1817, on the subject of that act.

Act declaring the existence of war between the United States and Mexico, May 13, 1846. Session Laws of 1846, Stat. at Large, 9.

Treaty of peace with Mexico, February 2, 1848. Session Laws, 1848, Stat. at Large, 108.

President Polk's message to Congress, 1846–47. 1 Executive Documents, 2d Session 29th Congress, No. 4.

President Polk's Message to Congress, 1847–48. 1 Executive Documents, 1st Session 30th Congress, No. 8.

Circulars of Mr. Walker, Secretary of the Treasury, to collectors and officers of the customs within the United States, during the existence of war with Mexico, 11th June, 1846 (1 Mayo, 326); 30th June, 1846 (Ibid. 328); 8th December, 1846 (Ibid. 358); 16th December, 1846 (Ibid. 358); 7th April, 1847 (Ibid. 425).

President Polk to Secretary Walker, 23d March, 1847, 1 Mayo, 412.

Secretary Walker to the President, 30th March, 1847, 1 Mayo, 413.

President to Secretaries of War and Navy, 31st March, 1847, 1 Mayo, 415, 417.

Instructions of Secretaries of War and Navy to officers, 3d April, 1847, 1 Mayo, 416, 417.

Secretary Walker to the President, 10th June, 1847, and orders of President thereon, 1 Mayo, 425.

The same to the same, 5th November, 1847, 1 Mayo, 425, 426.

The same to the same, 16th November, 1847, Ibid. 426, 427.

Commodore Conner's despatch as to surrender of Tampico, 17th November, 1846. 7 Executive Documents, 1st Session 30th Congress, No. 60, p. 270.

See also General Taylor's despatch to Adjutant-General, 26th November, 1847, Ibid. 378.

The construction contended for by the other side would render illegal the whole action of the government. A tariff was prescribed under the authority of the President, by which certain duties were levied upon goods when imported into Mexican ports when they were in our possession. Where did he get that power? Not from any act of Congress laying those duties, but in virtue of his character as commander-in-chief of the army, and in the exercise of military authority over the conquered country. If these ports were within the United States, the President would have no right to collect a revenue from them. The money was not only collected, but also disbursed by officers of the army and navy for the maintenance of the public service, without being brought into the treasury of the United States. All this practice must be condemned, and the money thus collected refunded, if the court should decide Tampico to have been an American port. All the inhabitants, too, must have become converted into American citizens.

*Mr. Webster*, in reply and conclusion, said that there was a difference between the Territories and the other parts of the United States. Judges were there appointed for terms of years, which the Constitution forbade as to other parts of the country. Hence, the part of the Constitution which directs that duties must be equal in all the ports of the United States does not apply to Territories. A foreign country is that which is without the sovereignty of the United States, and exclusively within the sovereignty of some other nation. In the Castine case, this court decided that the question must be tested by the sov-

Fleming et al. v. Page.

ereignty. If that is in the United States, then the port is not a foreign port. Its being held under a military power makes no difference. We think it is the fact of sovereignty which decides to what nation the port belongs. The difference between this country and England, as to the source of the war-making power, is supposed by the Attorney-General to create a difference in the rule which governs exports and imports; but he shows no reason or authority for this conclusion. If the fact of sovereignty exists, it is no matter whether there was a war or not. His argument is, that the acquisition accrues to Congress, because Congress possesses the war-making power. We agree that the acquisition accrues to the government which conquers it, and if he could show that it does not accrue to the crown in England until there is some act of acceptance, then his argument would have weight. But there is no case to show this. The presumption is, that the acquisition accrues to the power which makes the conquest, and that sovereignty vests immediately. 1 Cowper, 208. The best exposition of this matter is contained in Executive Documents, House, No. 20, 2d Session of the 30th Congress. The right to conquer the territory of the enemy, and levy contributions, is claimed under the laws of nations. Congress could not have directed the mode of carrying on the war. The consequences of acts done under the laws of nations are just the same in this government as in all others. The theory that a conquest accrues to the king in England is merely technical. As to Florida, the treaty was not ratified until 1821 or 1822, although made in 1819. The Treasury Circular of 29th June, 1845, recites a circular from the Department issued in the Florida case, saying that goods from Pensacola must pay duties until Congress created a collection district there. But this was a misapprehension of the true ground of this decision. The Attorney-General (Ex. Doc., 2d Session 25th Congress, p. 358), in the case of the Olive Branch, said that the jurisdiction of the former sovereign continued until possession was delivered. The reason was, that Florida was not ceded. The vessel sailed from Pensacola on the 14th of July, and possession was not delivered to the United States until the 17th of July.

The Attorney-General says, that our title to California rests upon treaty, and not upon conquest. But it was ours before the treaty was made, and goods were brought from there into the United States free of duty. In the case of Tampico, how can we move an inch without seeing that it was an American port? Here are instructions from the executive department of the government to regulate things there for a year before

Congress took up the matter. An effort is made to connect this subject with the military contributions. But they are not alike. This case relates to our own office in the city of Philadelphia. It has no connection with contributions levied in Mexico, or collecting duties there. Tampico belonged to us just as much as Castine belonged to the British. Possession for one purpose is possession for all purposes. If it did not belong to us, whose was it? Did it belong to Mexico? Suppose a British or French fleet had attacked it whilst our flag was flying over it, would it not have been considered as making war upon the United States?

Mr. Chief Justice TANEY delivered the opinion of the court.

The question certified by the Circuit Court turns upon the construction of the act of Congress of July 30, 1846. The duties levied upon the cargo of the schooner Catharine were the duties imposed by this law upon goods imported from a foreign country. And if at the time of this shipment Tampico was not a foreign port within the meaning of the act of Congress, then the duties were illegally charged, and, having been paid under protest, the plaintiffs would be entitled to recover in this action the amount exacted by the collector.

The port of Tampico, at which the goods were shipped, and the Mexican State of Tamaulipas, in which it is situated, were undoubtedly at the time of the shipment subject to the sovereignty and dominion of the United States. The Mexican authorities had been driven out, or had submitted to our army and navy; and the country was in the exclusive and firm possession of the United States, and governed by its military authorities, acting under the orders of the President. But it does not follow that it was a part of the United States, or that it ceased to be a foreign country, in the sense in which these words are used in the acts of Congress.

The country in question had been conquered in war. But the genius and character of our institutions are peaceful, and the power to declare war was not conferred upon Congress for the purposes of aggression or aggrandizement, but to enable the general government to vindicate by arms, if it should become necessary, its own rights and the rights of its citizens.

A war, therefore, declared by Congress, can never be presumed to be waged for the purpose of conquest or the acquisition of territory; nor does the law declaring the war imply an authority to the President to enlarge the limits of the United States by subjugating the enemy's country. The United States, it is true, may extend its boundaries by conquest or treaty, and

may demand the cession of territory as the condition of peace, in order to indemnify its citizens for the injuries they have suffered, or to reimburse the government for the expenses of the war. But this can be done only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the President by the declaration of war. His duty and his power are purely military. As commander-in-chief, he is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy. He may invade the hostile country, and subject it to the sovereignty and authority of the United States. But his conquests do not enlarge the boundaries of this Union, nor extend the operation of our institutions and laws beyond the limits before assigned to them by the legislative power.

It is true, that, when Tampico had been captured, and the State of Tamaulipas subjugated, other nations were bound to regard the country, while our possession continued, as the territory of the United States, and to respect it as such. For, by the laws and usages of nations, conquest is a valid title, while the victor maintains the exclusive possession of the conquered country. The citizens of no other nation, therefore, had a right to enter it without the permission of the American authorities, nor to hold intercourse with its inhabitants, nor to trade with them. As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries.

But yet it was not a part of this Union. For every nation which acquires territory by treaty or conquest holds it according to its own institutions and laws. And the relation in which the port of Tampico stood to the United States while it was occupied by their arms did not depend upon the laws of nations, but upon our own Constitution and acts of Congress. The power of the President under which Tampico and the State of Tamaulipas were conquered and held in subjection was simply that of a military commander prosecuting a war waged against a public enemy by the authority of his government. And the country from which these goods were imported was invaded and subdued, and occupied as the territory of a foreign hostile nation, as a portion of Mexico, and was held in possession in order to distress and harass the enemy. While it was occupied by our troops, they were in an enemy's country, and not in their own; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than

the submission and obedience, sometimes called temporary· allegiance, which is due from a conquered enemy, when· he surrenders to a force which he is unable·to resist. But the boundaries of the United States, as they existed when war was declared against Mexico, were not extended by the conquest; nor could they·be. regulated by the·varying incidents of war, and be enlarged or diminished as the armies on either side advanced or retreated. · They remained unchanged. And every place which was out of the limits of the United States, as previously established by·the political authorities of the government, was still foreign; nor did our laws extend over it. Tampico was, therefore, a· foreign port when·this shipment was made.

Again, there was no act of Congress establishing a customhouse at Tampico, nor authorizing the appointment of a collector; and, consequently, there was no officer of the United States authorized by law to grant·the clearance and. authenticate the coasting manifest of the cargo, in the manner directed by law, where the voyage is from one port of the United States to another. The person who acted in the character of collector in this instance, acted as such under the authority of the military commander,·and in obedience to his orders; and the duties ·he exacted, and the regulations he adopted,· were not those prescribed by law; but by the President in his character of commander-in-chief. The custom-house was established in an enemy's country, as one of the weapons of war. It was established, not for the purpose of giving to the people of Tamaulipas the benefits of commerce with the United States, or with other countries, but as a measure of hostility, and as a part of the military operations in Mexico; it was a mode of exacting contributions from the enemy to support our army, and intended also to cripple the resources of Mexico, and make it feel the evils and burdens of the war. The duties required·to be paid were regulated with this view, and were nothing more than contributions levied·upon the enemy, which the usages of war justify when an· army is operating in the enemy's country. The permit and coasting manifest granted by an officer thus appointed, and thus controlled by military authority, could not be recognized in any port of·the United States, as the documents required by the act of Congress when the vessel is engaged in the coasting trade, nor could they exempt the cargo from the payment of duties.

This construction of the revenue laws has been uniformly given by the administrative department of the government in ·every case that has come before it. And it has, indeed, been given in cases where there appears to have been stronger

Fleming et al. *v.* Page.

ground for regarding the place of shipment as a domestic port. For after Florida had been ceded to the United States, and the forces of the United States had taken possession of Pensacola, it was decided by the Treasury Department, that goods imported from Pensacola before an act of Congress was passed erecting it into a collection district, and authorizing the appointment of a collector, were liable to duty. That is, that although Florida had, by cession, actually become a part of the United States, and was in our possession, yet, under our revenue laws, its ports must be regarded as foreign until they were established as domestic, by act of Congress ; and it appears that this decision was sanctioned at the time by the Attorney-General of the United States, the law officer of the government. And although not so directly applicable to the case before us, yet the decisions of the Treasury Department in relation to Amelia Island, and certain ports in Louisiana, after that province had been ceded to the United States, were both made upon the same grounds. And in the latter case, after a custom-house had been established by law at New Orleans, the collector at that place was instructed to regard as foreign ports Baton Rouge and other settlements still in the possession of Spain, whether on the Mississippi, Iberville, or the sea-coast. The Department in no instance that we are aware of, since the establishment of the government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress.

The principle thus adopted and acted upon by the executive department of the government has been sanctioned by the decisions in this court and the Circuit Courts whenever the question came before them. We do not propose to comment upon the different cases cited in the argument. It is sufficient to say, that there is no discrepancy between them. And all of them, so far as they apply, maintain, that under our revenue laws every port is regarded as a foreign one, unless the custom-house from which the vessel clears is within a collection district established by act of Congress, and the officers granting the clearance exercise their functions under the authority and control of the laws of the United States.

In the view we have taken of this question, it is unnecessary to notice particularly the passages from eminent writers on the laws of nations which were brought forward in the argument. They speak altogether of the rights which a sovereign acquires, and the powers he may exercise in a conquered country, and they do not bear upon the question we are considering. For

52 *

in this country the sovereignty of the United States resides in the people of the several States, and they act through their representatives, according to the delegation and distribution of powers contained in the Constitution. And the constituted authorities to whom the power of making war and concluding peace is confided, and of determining whether a conquered country shall be permanently retained or not, neither claimed nor exercised any rights or powers in relation to the territory in question but the rights of war. After it was subdued, it was uniformly treated as an enemy's country, and restored to the possession of the Mexican authorities when peace was concluded. And certainly its subjugation did not compel the United States, while they held it, to regard it as a part of their dominions, nor to give to it any form of civil government, nor to extend to it our laws.

Neither is it necessary to examine the English decisions which have been referred to by counsel. It is true that most of the States have adopted the principles of English jurisprudence, so far as it concerns private and individual rights. And when such rights are in question, we habitually refer to the English decisions, not only with respect, but in many cases as authoritative. But in the distribution of political power between the great departments of government, there is such a wide difference between the power conferred on the President of the United States, and the authority and sovereignty which belong to the English crown, that it would be altogether unsafe to reason from any supposed resemblance between them, either as regards conquest in war, or any other subject where the rights and powers of the executive arm of the government are brought into question. Our own Constitution and form of government must be our only guide. And we are entirely satisfied that, under the Constitution and laws of the United States, Tampico was a foreign port, within the meaning of the act of 1846, when these goods were shipped, and that the cargoes were liable to the duty charged upon them. And we shall certify accordingly to the Circuit Court.

Mr. Justice McLEAN dissented.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and on the point or question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this court for its opinion, agreeably

to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, that Tampico was a foreign port within the meaning of the act of Congress of July 30, 1846, entitled "An act reducing the duties on imports, and for other purposes," and that the goods, wares, and merchandise as set forth and described in the record were liable to the duties charged upon them under said act of Congress. Whereupon it is now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.