Peelle, J.,
delivered the opinion of the court:
This action is for the refund of impost duties collected in the ports of Cuba during the occupation of that island b}? the military forces of the United States on goods imported thereto from the United States by a citizen of the United States after the treaty of Pa.ris.
By reason of the failure or inability of the Spanish Government for a number of years to subdue and pacify the insurrectionists in the island of Cuba, and to protect the property of American citizens therein, the peace and commerce *503 of the United States became endangered. As the conflict ensued it beeame more evident that some decisive action would have to be taken by the United States, of a self-defensive character, looking to the liberation of the Cuban people from the rule of the Spanish Government. With that purpose in view the Congress passed the following joint resolution, approved April 20, 1898 (30 Stat. L., 738) :
“ Whereas the abhorrent conditions which have existed for more than three years in the island of Cuba, so near our own borders, have shocked the moral sense of the people of the United States, have been a disgrace to Christian civilization, culminating, as they have, in the destruction of the United States battle ship, with two hundred and sixty-six of its officers and crew, while on a friendly visit in the harbor of Havana, and can not longer be endured, as has. been set forth by the President of the United States in his message to Congress of April eleventh, eighteen hundred and ninety-eight, upon which the action of Congress was invited: Therefore,
“Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, First, That the people of the island of Cuba are, and of right ought to be, free and independent.
“ Second. That it is the duty of the United States to demand, and the Government of the United States does hereby demand, that the Government of Spain at once relinquish its authority and government in the island of Cuba and withdraw its land and naval forces from Cuba and Cuban ■waters.
“ Third. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry these resolutions into effect.
“ Fourth. That the United States hereby disclaims any disposition or intention to exercise sovereignty, jurisdiction, or control over said island except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the island to its people.
“Approved, April 20, 1898.”
The next day (April 21) war began between the United States and the Kingdom of Spain, as declared by the Congress in the act of April 25, 1898 (30 Stat. L., 364). And the following day (April 22) the President, on the authority *504 of said joint resolution, deeming “ it necessary to set on foot and maintain a blockade on the north coast of Cuba,” issued his proclamation therefor (30 Stat. L., 1769), and such blockade was established and effectively maintained and war was prosecuted between the belligerent Governments until a protocol for the establishment of peace was signed by their respective representatives at the city of Washington August 12, 1898 (30 Stat. L., 1742), after which hostilities viere suspended and so continued until the final terms of peace were agreed upon by the treaty of Paris of December 10, 1898, the ratifications of which were exchanged in the city of Washington on the 11th day of April, 1899, and the treaty proclaimed by the President on the same day (30 Stat. L.,1754).
By Article I it was provided:
“ Spain relinquishes all claim of sovereignty over and title to Cuba.
“ And as the island is, upon its evacuation by -Spain, to be occupied by the United States, the United States null, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property.”
The obligations assumed by the United States in respect to Cuba were by Article XVI of the treaty limited “ to the time of its occupation thereof.”
It will thus be observed that by the terms of the treaty, as well as in conformity with the resolutions aforesaid, Spain relinquished “ all claim of sovereignty over and title to Cuba,” and that upon the occupation thereof by the United States they assumed, during such occupancy, the obligations resulting therefrom “ under international law ” for the protection of life and property.
International law is a system of rules founded upon long-established customs and acts of states and international agreements, not inconsistent with the principles of natural justice, which Christian and civilized states recognize as obligatory in their relations and dealings with each other, as well as with the citizens and subjects of each.
That the .United States had the right to intervene to stop *505 the effusion of blood and to protect tbe peace and commerce of the United States, as well as the lives and property of their own citizens in Cuba, has passed beyond the domain of forensic debate, as well as beyond judicial inquiry, and has become, if it was not before, a rule of international law.
The United States intervened, and did so through the President by authority of the resolutions, which were in substance and effect embodied in the treaty, the result of all which was the occupation of Cuba by the military forces of the United States.
In the case of Neely v. Henkel (180 U S., 109, 117) the objects of that occupation are shown by reference to a proclamation issued by the military governor and major-general commanding the division of Cuba to be “ to give protection to the people, security to persons and property, to restore confidence, to encourage the people to resume the pursuits of peace, to build up waste plantations, to resume commercial traffic, and to afford full protection in the exercise of all civil and religious rights.
In furtherance of those objects and by authority of the President, the military governor, by order, established various civil departments, each under the charge of a secretary ; and later, by separate orders, created a supreme court, with jurisdiction throughout the island, and defined the jurisdiction of the ordinary criminal courts.
In speaking of the relation of Cuba to the United States and the character of its occupation thereby, the court, in the case of Neely v. Henkel (supra), page 120, says:
“ Cuba is none the less foreign territory, within the meaning of the act of Congress, because it is under a military governor appointed by and representing the President in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without interference by other nations. The occupancy of the island by troops of the United States was the necessary result of the Avar. That result could not have been avoided by the United States consistently with the principles of international laAv or with its obligations to the people of Cuba.
“ It is true that as between Spain and the United States— indeed, as between the United States and all foreign nations — Cuba, upon the cessation of hostilities with Spain and *506 after the treaty of Paris was to be treated as if it were conquered territory. But, as between the United States and Cuba, that island is territory held in trust for the inhabitants of Cuba, to whom it rightfully belongs and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action.”
Therefore it has been judicially determined, first, that Cuba was during the occupation thereof by the military forces of the United States foreign territory, and, second, that as between the United States and Cuba the island was held in trust “ for the inhabitants of Cuba,” to whom the island, says the court, “ rightfully belongs.”
This being so, we might stop here, as the theory of the claimant is'that when the Kingdom of Spain relinquished all sovereignty over and title to Cuba they at once vested in the United States, all else having been taken by force of arms; and that as Cuba thereby became territory of the United States the decisions of the Supreme Court in the cases of De Lima v. Bidwell and Dooley v. United States (182 U. S. R., 1 and 222) are controlling. But the theory that sovereignty over and title to Cuba vested in the United States upon the relinquishment thereof by Spain is negatived bjr the language of the treaty which follows the words of the relinquishment, i. e., “And as the island is, upon its evacuation by Spain, to be occupied by the United States, the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property.”
In the present case, as the United States expressly disclaimed any intention to exercise sovereignty, jurisdiction, or control over the island, “ except for the pacification thereof,” the ownership of the island, upon the relinquishment by Spain of her sovereignty over it, immediately passed to the inhabitants of Cuba, who, in the resolutions referred to, were declared to be free and independent, and in whom, therefore, abstractly considered, sovereignty resided.
Had the language been “ Spain cedes to the United States the island of Cuba,” as by Article II she did Porto Pico, that Avould have divested her of all title to and, by consequence, all *507 sovereignty over Cuba, both of which would then immediately have passed to the United States, as they did in the case of Porto Rico; subject, however, to the rights of the people. True, when, pursuant to the treaty, the United States occupied the island, the inhabitants thereof during such occupancy undoubtedly owed allegiance to the United States, i. e., fidelity and obedience for the protection they received, but that did not divest them of their inherent rights.
The President, as Commander in Chief of the Army and Navy, had the undoubted right to prescribe rules and regulations having the force of law for the peaceable government of the island during the occupation by the military forces, but he had no authority to extend the Union so as to embrace within it territory acquired either by treaty or conquest without authority from the legislative branch of the Government. (Fleming et al. v. Page, 9 How., 603.)
In that case the United States, by the President as military commander, pursuant to authority of Congress, during the war with Mexico conquered, took possession of, and held the port of Tampico, but the Supreme Court held that such territory did not thereby become a part of the Union, but remained a foreign port, and the duties collected upon goods imported therefrom into the United States were properly levied, and hence no recovery could be had for a refund of the duties so collected. That case comes near being analogous to the present case.
During the occupation the people of the island were for a brief time, and while in preparation therefor, denied the right of self-government, but when the people had by their " voluntary action ” organized a “ stable government ” the United States withdrew and left “ the government and control of the island to its people,” the rightful owners. The territory being foreign, and occupied for a specific purpose, the United States could exercise no right of ownership, jurisdiction, sovereignty, or control which would operate to make the island territory of the United States. To have done so would have been a violation of their trust and an act of bad faith toward the Cuban people. The powers and functions which were exercised by the United States were *508 strictly in line with their duties as a trustee for the protection and security of persons and property, having in view the restoration of confidence, and the encouragement of the people to resume the pursuits of peace. In furtherance of that trust it became, among other things, necessary, and there were collected from May 30, 1900, to April 29, 1902, at Sagua La Grande, Cuba, as set forth in the findings, duties aggregating $51,104.20 on goods, and merchandise imported thereto from the United States by the claimant corporation, a citizen of the United States.
The levy and collection of taxes for the support of government may in a sense be said to be the precursors of civilization, as they are the essential and material forces for the establishment of that social order from which man’s improved condition results, and without which the trustee in this case Avould have been hindered, if not prevented, from executing its trust. That the trust might be effectively and in good faith carried out, the President, as Commander in Chief of the Army and Navy of the United States, issued the order of March 31, 1900, set forth in the findings, directing that after June 15, 1900, there be levied and collected, under the supervision of the War Department, such tariff and duties as might be necessary for the purpose of the occupation. The order was issued by the President as Commander in Chief of the Army and Navy of the United States, and was therefore a war measure to enable them to discharge the functions and obligations which, by virtue of the treaty and the vicissitudes of war, devolved upon them.
It was a trust of the most solemn and sacred character, undertaken for the liberation of a people struggling for self-government and having for its object the establishment of a republic founded upon the consent of the governed.
Such being the case, should the merchandise of a citizen of the United States imported into Cuba from the United States have been exempted from the payment of such duties because the United States were, for the pacification thereof, exercising the functions of government over the island ?
To have done so would have been an act of bad faith toward the people of Cuba, as they were entitled not only to have the revenues honestly collected, but were entitled to *509 have all the revenues accruing to the island, from whatever source, applied to the pacific object of the occupation.
The duties of an ordinaiw trustee are to render to his cestui qiie trust an accurate account of his doing's, showing receipts and disbursements made by him, including all money , which he might with diligence have received, and any loss occurring through his negligence he must make good. While that rule may not in strictness be applicable to the United States in the exercise of governmental functions as a trustee over the island, still in the forum of public conscience, as well as under the test of those rules of international law to which I have referred, the United- States would be held responsible for an honest and accurate account of their doings. That account they rendered, and on May 20, 1902, transferred to the duly' elected representatives of the people in the Congress of the Republic the government and control of the island. No protest was made- by the Republic of Cuba to the manner in which the United States had governed the island, nor did the claimant, either at the time, of the collection of the impost duties which he seeks to have refunded or at any subsequent time until the bringing of this action, object to or protest against the collection thereof. What was done by the United States was lawfully done, and hence'no right can be founded thereon in the claimant’s favor for the recovery of the duties so collected, and his petition is dismissed.