# Constitutionality of Pending Bills Restricting the Withdrawal of Public Land for National Defense

Pursuant to his constitutional powers as Commander in Chief, the President, particularly in time of war or national emergency, may have authority without the authorization of Congress to reserve and use public lands for the training and deployment of the armed forces of the United States for national defense purposes.

If the above is true, any attempted restriction of this authority by Congress would be an unconstitutional invasion of the President's authority as Commander in Chief.

July 12, 1956

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

This is in reply to your memorandum dated April 18, 1956, requesting my comments on H.R. 10,362, H.R. 10,366, H.R. 10,367, H.R. 10,371, H.R. 10,372, H.R. 10,377, H.R. 10,380, H.R. 10,384, H.R. 10,394, and H.R. 10,396 (all pending in the 84th Congress). The stated purpose of the bills is "[t]o provide that withdrawals or reservations of more than five thousand acres of public lands of the United States for certain [defense purposes] shall not become effective until approved by Act of Congress."

Sections 1 and 2 of H.R. 10,366, 10,367, 10,372, 10,377, 10,394 and 10,396 provide that on and after the enactment of the bill, notwithstanding any other provisions of law, no public land, water, or land and water area of the United States, including public lands in the Territory of Alaska, shall be (1) withdrawn from settlement, location, sale, or entry, in order that it may be used for defense purposes, or (2) reserved for such purposes, except by Act of Congress. Sections 1 and 2 of H.R. 10,362, 10,371, 10,380 and 10,384 differ from the aforementioned bills in that these latter bills provide that the provisions of the Act will not apply in time of war or in a national emergency declared by the President or by act of Congress.

Article IV, Section 3, Clause 2 of the United States Constitution provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." However, from an early period in the history of the federal government, the President, without special authorization from Congress, has withdrawn public lands from private settlement and acquisition even though Congress had opened them to such occupancy. In the case of *Grisar v. McDowell*, 73 U.S. (6 Wall.) 363, 381 (1867), which involved the reservation of public lands for military purposes, the Supreme Court of the United States noted that the authority of the President to reserve public lands from sale and set them apart for public uses had been recognized in numerous acts of Congress.

The effect of H.R. 10,362 and the other captioned bills would be to restrict the President's authority to withdraw, for defense purposes, public lands or waters, in

excess of five thousand acres, from private settlement, location, sale or entry. A question is presented whether such a restriction can be placed on the President by act of Congress.

In the case of *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), the Supreme Court passed on the question whether the President could constitutionally exercise regulatory power over the public domain. In the *Midwest Oil* case the Congress had opened the public lands containing petroleum to occupation, exploration and purchase by citizens of the United States. *Id.* at 465. In 1909 it was discovered that large areas of that public lands in California contained oil, and extensive exploitation was undertaken by private parties. This exploitation was so rapid that the Secretary of the Interior advised the President that unless public lands containing petroleum were withdrawn from entry, settlement, and exploitation, the United States Navy would be forced to buy its oil from private parties exploiting former federal public lands. In the light of these facts, the President, without the express authorization of Congress, withdrew "in aid of proposed legislation" large areas of the public domain in California and Wyoming. *Id.* at 467. This authority was properly challenged in the courts.

In passing on the matter, the Supreme Court noted that, though the Constitution gave Congress the power to dispose of and make all needful rules and regulations respecting the public lands, nevertheless, former presidents, without special authorization from Congress, had in a large number of cases, for a public use or purpose, withdrawn public lands from occupation and settlement by private parties. The Court further noted that this long-continued practice had never been repudiated by Congress; rather Congress had apparently recognized that the Executive was in an advantageous position to protect the public domain for public purposes and uses. The Court held that, while the Executive cannot by a course of action create a power, Congress by its long and continuous acquiescence in the exercise by the President of management over the public domain had given the President the implied power as Chief Executive to exercise administrative power over the public domain. Therefore, the Court held that, for a public use or purpose, the President had the power to withdraw the public lands in question from private settlement or occupation even though Congress may have previously opened the lands for such use. *Cf. Sioux Tribe v. United States*, 316 U.S. 317 (1942).

The Supreme Court has also indicated in both the *Midwest Oil* case and *Sioux Tribe* case that, since Congress had the constitutional power to regulate the use of public lands, it could by express action limit or revoke this implied delegation of power to the President. And in fact, in the situation involved in the *Midwest Oil* case, Congress subsequently did curtail somewhat the President's administrative powers over the public lands in question. *See* Pub. L. No. 61-303, 36 Stat. 847 (1910); *Withdrawal of Public Lands*, 40 Op. Att'y Gen. 73 (1941).

In arguing the *Midwest Oil* case, one of the contentions of the government was that the President, as Commander in Chief, had the power to issue the order in question for the purpose of retaining and preserving a source of supply of fuel for

the Navy. The Supreme Court, however, decided the case in favor of the federal government on different grounds.

As pointed out above, H.R. 10,362 and the other captioned bills would restrict the President's authority to use public lands for defense purposes. It is my opinion that the bills, especially those that do not contain a national emergency or war exception, present a serious constitutional question which the courts have never passed on in regard to the President's powers as Commander in Chief.

It is clear that the President's powers as Commander in Chief cannot be intruded upon by Congress, just as the war powers of Congress cannot be intruded upon by the President. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866). However, the nature and extent of the President's constitutional war powers are not clearly defined or specified in the Constitution. Article II, Section 2, Clause 1 of the Constitution simply provides:

> The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual service of the United States . . . .

Clearly, the President is Commander in Chief both in time of peace and war.

In reply to a request from the Senate for an opinion as to the powers of the President during a national emergency or state of war, Attorney General Murphy stated:

> You are aware, of course, that the Executive has powers not enumerated in the statutes—powers derived not from statutory grants but from the Constitution. It is universally recognized that the constitutional duties of the Executive carry with them the constitutional powers necessary for their proper performance. These constitutional powers have never been specifically defined, and in fact cannot be, since their extent and limitations are largely dependent upon conditions and circumstances. In a measure this is true with respect to most of the powers of the Executive, both constitutional and statutory. The right to take specific action might not exist under one state of facts, while under another it might be the absolute duty of the Executive to take such action.

*Request of the Senate for an Opinion as to the Powers of the President "In Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347–48 (1939).

The courts have several times dealt with the President's constitutional powers as Commander in Chief, but it is clear that in doing so they have not made a clear demarcation of the boundaries of said power. *See Fleming v. Page*, 50 U.S. (9 How.) 603, 614–15 (1850); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1867);

*Prize Cases*, 67 U.S. (2 Black) 635, 668, 670 (1863); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

In the case of the bills in question, the issue is whether the Congress can restrict the President, as Commander in Chief, in the use of public lands of the United States for national defense purposes. As pointed out above, the courts have never passed on this precise question. In this regard it should be noted that no private rights are involved, since a person has no private rights in the public lands until he has made a legal entry upon the lands, and they cease to become part of the public domain. *Reservation of Land for Public Uses*, 17 Op. Att'y Gen. 160 (1881).

The classic statement of the powers of the Commander in Chief is set forth in the case of *Fleming v. Page*, where it was said by Mr. Chief Justice Taney:

> As commander-in-chief, he [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy.

50 U.S. at 615.

As Commander in Chief it has been held that the President, during time of war, has powers of his own concerning the use of private property for national defense purposes. In the case of *United States v. McFarland*, 15 F.2d 823, 826 (4th Cir. 1926), it was stated that the President, as Commander in Chief, has the constitutional power in war time, in cases of immediate and pressing exigency, to appropriate private property to public uses in order to insure the success of a military operation, the government being bound to make just compensation thereafter. *See also Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1851); *United States v. Russell*, 80 U.S. (13 Wall.) 623 (1871); *Roxford Knitting Co. v. Moore & Tierney, Inc.*, 265 F. 177, 179 (2d Cir. 1920). However, the Supreme Court has also held that the President, as Commander in Chief, cannot seize the property of private citizens in time of emergency, contrary to an act of Congress, to prevent interruption of the production of supplies for the armed forces. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

The Attorney General has indicated that the President, as Commander in Chief, has broad constitutional powers to obtain military bases for the national defense. In *Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers*, 39 Op. Att'y Gen. 484 (1940), Attorney General Jackson dealt with the question whether the President, pursuant to his powers to administer foreign relations and as Commander in Chief, could acquire by executive agreement, and without action by Congress, the right to obtain foreign naval and military bases for the armed forces of the United States. It was stated:

> One of these is the power of the Commander in Chief of the Army and Navy of the United States, which is conferred upon the Pres-

ident by the Constitution but is not defined or limited. Happily, there has been little occasion in our history for the interpretation of the powers of the President as Commander in Chief of the Army and Navy. I do not find it necessary to rest upon that power alone to sustain the present proposal. But it will hardly be open to controversy that the vesting of such a function in the President also places upon him a responsibility to use all constitutional authority which he may possess to provide adequate bases and stations for the utilization of the naval and air weapons of the United States at their highest efficiency in our defense. It seems equally beyond doubt that present world conditions forbid him to risk any delay that is constitutionally avoidable.

*Id.* at 486.

In regard to the command, training, and deployment of the armed forces, the Attorney General has stated:

Thus the President's responsibility as Commander in Chief embraces the authority to command and direct the armed forces in their immediate movements and operations designed to protect the security and effectuate the defense of the United States. As pointed out by the texts just cited, this authority undoubtedly includes the power to dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country. Likewise of course the President may order the carrying out of maneuvers or training, or the preparation of fortifications, or the instruction of others in matters of defense, to accomplish the same objective of safety of the country. Indeed the President's authority has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests.

*Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61–62 (1941).

In *Fort Missoula Military Reservation*, 19 Op. Att'y Gen. 370 (1889), the Attorney General was called on to construe an act of Congress which applied to the Territory of Oregon and provided that all reservations and withdrawals of public land for the purpose of establishing forts should be limited to 640 acres. The Attorney General did not pass on any constitutional problems that might have been involved since he found that the fort in question was located in Montana which, although once a part of the Oregon Territory, was not in his opinion covered by the Act.

In the light of the analysis set forth above, it appears that, pursuant to the constitutional powers as Commander in Chief, the President, particularly in time of war or national emergency, may have authority without the authorization of Congress to reserve and use the public domain for the training and deployment of the armed forces of the United States for national defense purposes. If the above is true, any attempted restriction of this authority by Congress would be an unconstitutional invasion of the President's authority as Commander in Chief. I, therefore, recommend that the Department report that it is opposed to sections 1 and 2 of he captioned bills since the sections would impose an unwarranted restriction upon the President's powers to use the public domain for national defense purposes, and for the additional reason that the bills, particularly H.R. 10,366 and similar bills, present a serious question regarding an unconstitutional restriction of the President's powers as Commander in Chief.[*]

Section 3, which in identical language is a part of all the captioned bills, prescribes the information which is to be contained in an application by an agency of the Department of Defense for a withdrawal or reservation of any public land, water, or land and water exceeding in the aggregate five thousand acres. Section 4 of the bills would provide that the head of each military department or agency owning or controlling any military installation or facility, whether created in whole or in part through withdrawal or reservation of the public lands, must require that all hunting, trapping, and fishing on said military installation or facility be in accordance with the laws of the state or territory where the installations or facility is located and be licensed by the state or territory. The section further provides for cooperation between the federal and state officials to carry out the above measures. Section 5 of the bills provides for certain amendments to the Federal Property and Administrative Service Act of 1949, Pub. L. No. 81-152, 63 Stat. 377.

Section 6 of H.R. 10,362 and some of the other captioned bills provide as follows:

> All withdrawals and reservations of public land for the use of any agency of the Department of Defense, heretofore or hereafter made by the United States, shall be deemed made without prejudice to val-

---

[*] Editor's Note: Two years later, in the 85th Congress, a bill similar to these became enrolled. In a subsequent opinion for the Deputy Attorney General on the constitutionality of the enrolled bill, also collected in this volume (*Constitutionality of Enrolled Bill Restricting the Withdrawal of Public Land for National Defense*, 1 Op. O.L.C. Supp. 192 (Feb. 24, 1958)), the Office took a narrower view of the President's preclusive authority as Commander in Chief. The Office observed that this 1956 opinion had failed to "refer to the majority per curiam opinion, in which Justice Reed concurred, that under Article IV, Section 3, Clause 2 of the Constitution the power of Congress over the public lands is 'without limitation,' *Alabama v. Texas*, 347 U.S. 272, 274 (1954) (per curiam), and the earlier decisions cited therein, including *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)." 1 Op. O.L.C. Supp. at 194.

> id rights to the beneficial use of water originating in or flowing across such lands, theretofore or thereafter initiated under the laws of the States in which such lands are situated.

This section has been omitted from H.R. 10,367 and H.R. 10,380.

In language, the section is substantially identical to section 9 of S. 863, 84th Cong., 2d Sess., as amended, except that, in keeping with the more limited purpose of those bills, the words "for the use of any agency of the Department of Defense" have been added. It is believed that, if enacted, the section could completely destroy the value of any reservation for military purposes. The language employed is extremely broad and is capable of no other interpretation than that the water supply of any military installation, whenever established, can be appropriated completely by others at any future time. As it is not readily conceivable that any military installation can endure without some assured water supply, enactment of the section could preclude any further withdrawals or reservations of public lands for military purposes. It could also force the United States to purchase by way of eminent domain, in cases where reservations are presently being used for military purposes, rights which were not in existence when the lands were withdrawn or reserved for such purposes. Such grave objections can be eliminated, in the view of this Office, only by striking the words "heretofore or" and "or thereafter" from H.R. 10,362, and by striking the same words from the other bills of which section 6 is a part.

For the foregoing reasons, it is recommended by this Office that the Department report that it is opposed to the enactment of sections 1, 2, and 6 of the captioned bills. This Office wishes to defer to any comments the Lands Division may make regarding sections 3, 4, and 5 of the bills.

J. LEE RANKIN
*Assistant Attorney General*
*Office of Legal Counsel*
