GOETZE et al. v. UNITED STATES.

(Circuit Court, S. D. New York. June 14, 1900.)

No. 3,076.

1. UNITED STATES—EXTENSION OF CONSTITUTION OVER NEW TERRITORY—MILITARY OCCUPATION.

The boundaries of the United States can be enlarged, and the operation of its institutions and laws extended over new territory, only by the treaty-making power or the legislative authority. The occupation of territory conquered in war, by the military forces of the United States, while it gives the United States title to such territory as against foreign nations, does not change the status of its inhabitants, who remain foreigners so far as regards their relation to the United States and its laws.

2. SAME—TERRITORY ACQUIRED BY CESSION—STATUS.

A treaty ceding territory to the United States, in order to have the effect of incorporating such territory as an integral part of the United States, under the constitution, and of giving its inhabitants the status of citizens thereof, must do so by express provision or by necessary implication. Whether a treaty stipulation alone is sufficient, without supplementary legislation, is not clearly established; but the mere fact of acquiring title to the soil, and dominion over it, cannot change the constitutional status of the inhabitants.

**3.** TREATIES—RULES OF CONSTRUCTION.

A treaty is not only a law, but also a contract between two nations; and, under familiar rules, it must, if possible, be so construed as to give full force and effect to all its parts.

**4.** UNITED STATES—STATUS OF PORTO RICO—CUSTOMS LAWS.

The provision of the treaty of Paris, by which Spain ceded to the United States Porto Rico and other islands, that "the civil rights and political status of the native inhabitants of the territories hereby ceded shall be determined by the congress," which was made to apply, also, to the native Spaniards residing in the ceded territory who failed to elect to retain their allegiance, must be given effect as a condition on which the cession was made and accepted. If within the constitutional power of the United States to accept the cession of territory on such condition, the effect of the treaty was to vest the title to the soil of the ceded islands in the United States, but to postpone any change in the relations of the inhabitants to the United States to await the action of congress. If the United States was without such power, the treaty was unconstitutional: but in no event could it have the effect of making the islands a part of the United States, and bringing them within the operation of its constitution, contrary to the clearly-expressed intention of the treaty-making power. Hence in either case the ceded territory remained a foreign country, within the meaning of the customs laws; and merchandise imported from Porto Rico into the United States after the signing of the treaty, but before any action by congress, was subject to the same duties as importations from other foreign countries.

**5.** SAME—POWER TO ACQUIRE AND GOVERN FOREIGN TERRITORY—CONSTITUTIONAL LIMITATIONS.

The United States, in common with all other sovereign nations, has the power to acquire dominion over new territory by cession, and to govern the same without incorporating it as an integral part of itself under its organic law. Such power is an ordinary and important attribute of sovereignty, which was possessed by the independent states, and which on the formation of the Union they denied to themselves in express terms and delegated to the federal government, in the treaty and war making powers; otherwise, the United States would be without the full sovereignty as a nation which is essential to enable it to assume and fulfill the international duties and obligations which must necessarily devolve upon it in some cases, as the result of successful war, without injustice to its own citizens. Nor could the United States, if the mere act of cession brings the ceded territory within the operation of the constitution, grant to the inhabitants of such territory the right to form an independent government, or relieve them from federal taxation, without entirely renouncing its own sovereignty.

**6.** SAME.

The argument in favor of the possession of such power by the United States is strengthened by the historical facts that the treaty of cession of Louisiana expressly provided that "the inhabitants of the ceded territory shall be incorporated in the Union of the United States and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States," and the subsequent treaties ceding Florida, California, and Alaska contained substantially similar provisions, and that in each case the cession was supplemented by an act of congress extending the customs laws of the United States over the ceded territory. In the cases of Louisiana and Florida, also, the treaties gave France and Spain special trade advantages in the ceded territory for a term of years, which would render such treaties unconstitutional if the act of cession ipso facto brought the territory ceded within the full operation of the uniformity clause of the constitution.

**7.** SAME.

The denial of the power of the United States to govern territory over which the constitution does not extend cannot be deduced from the fact that this is a republic, founded on the principle that all governments derive

their just powers from the consent of the governed, and bound to establish and maintain a republican form of government throughout its dominions, since such a form of government can as readily be established and maintained in territory outside the sphere of the constitution as within it, and the same civil and political rights given to its inhabitants. The fundamental principles of our government and the negative provisions of the constitution in favor of personal rights may well be held, by inference and the general spirit of the constitution, to limit the powers of congress in the government of any territory.

8. SAME—ACQUISITION OF NEW TERRITORY—VALIDITY OF CONDITIONS OF TREATY.
The United States, having power to acquire territory by cession without incorporating it fully under its organic laws, may make such treaty stipulations in regard to the constitutional status of the inhabitants of ceded territory as are deemed for the best interests of such inhabitants and its own citizens, and the provision of the treaty of Paris leaving the status of the inhabitants of the islands ceded by Spain to be fixed by congress is valid.

Appeal by the importers from a decision of the board of general appraisers which sustained the assessment of duty by the collector upon the merchandise in question.

Everit Brown and Edward C. Perkins, for appellants.
Henry L. Burnett and Henry C. Platt, U. S. Attys.

TOWNSEND, District Judge. On June 6, 1899, John H. Goetze & Co. imported from Porto Rico into the port of New York 100 bales of leaf or filler tobacco, upon which duty was assessed at 35 cents per pound, as "filler tobacco not specially provided for," pursuant to the provisions of paragraph 213 of the tariff act of July 24, 1897, commonly known as the "Dingley Act." The importer protested, claiming that the merchandise was not subject to duty, because Porto Rico was not a foreign country, and because, therefore, the "imposition of duties on goods brought from a place within the territory of the United States into a port of the United States is not lawful and valid under the constitution." There is no dispute as to the classification of the tobacco or as to the rate of duty, provided the imposition is lawful.

A preliminary question of jurisdiction has been disposed of in the suit of Lascelles v. Bidwell, 102 Fed. 1004, recently brought to enjoin the collector from collecting the duties. Judge Lacombe denied the motion of the complainants therein for an injunction, on the ground that they "have an adequate, summary, and expeditious remedy at law, under the customs administrative act."

The tariff act of July 24, 1897, provides "that on and after the passage of this act, unless otherwise specially provided for in this act, there shall be levied, collected and paid upon all articles imported from foreign countries, and mentioned in the schedules herein contained, the rates of duty which are, by the schedules and paragraphs, respectively prescribed." 30 Stat. 151. The constitution provides that "all duties, imposts, and excises, shall be uniform throughout the United States." Article 1, § 8. Before the war with Spain, Porto Rico was a foreign country. It did not cease to be a foreign country when it was occupied by the military forces of the United States. Its status at that time is settled by the decision of the supreme court in Fleming

v. Page, 9 How. 603, 13 L. Ed. 276. The port of Tampico had been wrested from Mexico, and was held by the United States until the final treaty of peace. During that time duties on goods imported from that port were protested on the ground that Tampico was part of the United States. Chief Justice Taney, in writing the decision to the effect that Tampico was a foreign country, says:

"The country was in the exclusive and firm possession of the United States, and governed by its military authorities, acting under the orders of the president. But it does not follow that it was a part of the United States, or that it had ceased to be a foreign country, in the sense in which these words are used in the acts of congress. * * * By the laws and usages of nations, conquest is a valid title while the victor maintains the exclusive possession of the conquered country. The citizens of no other nation, therefore, had a right to enter it without the permission of the American authorities, nor to hold intercourse with its inhabitants, nor to trade with them. As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries. But yet it was not a part of this Union."

The conquest of Porto Rico under authority of the executive made it ours by military title. But the president's "conquests do not enlarge the boundaries of this Union, nor extend the operation of our institutions and laws beyond the limits before assigned to them by the legislative power." Our boundaries could not "be regulated by the varying incidents of war, and be enlarged or diminished, as the armies on either side advanced or retreated." Fleming v. Page, supra. In this sense, therefore, our constitutional boundaries do not "follow the flag." An extension of the boundaries of the United States can be made "only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the president by the declaration of war." Id.

The conquest of Porto Rico did not incorporate the island within the United States. Did the treaty of cession accomplish that result? What action on the part of the treaty-making power is essential in order to effect a complete incorporation of new territory, and whether this result can be accomplished at all without supplementary legislation, is by no means settled. In the treaty of cession of Louisiana it was provided that:

"The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States." Article 3.

Whether this provision brought the new territory within our boundaries is a question which has not arisen. Congress, shortly after the ratification of the treaty, passed acts providing for the extension of our customs and other laws over Louisiana. 2 Stat. 245, 251, 283. The treaty which ceded Florida contained an almost identical provision for the incorporation of the inhabitants of that territory. Of this treaty Chief Justice Marshall said:

"This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States." Insurance Co. v. Canter, 1 Pet. 542, 7 L. Ed. 255.

Whether they would be admitted independently of this stipulation, he refuses to discuss. Congress, however, deemed it necessary to pass

special enactments in order to extend our revenue and other general laws over the new territory. 3 Stat. 637, 657. In the treaty of 1848 with Mexico, providing for the cession of California, it was stipulated that Mexicans remaining in the ceded territory who did not elect to retain their former citizenship "shall be incorporated into the Union and be admitted at the proper time (to be judged of by the congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution." Article 9, Treaties and Conventions, 686 (9 Stat. 930). Congress, within a year from the treaty of cession, extended our revenue laws to California. 9 Stat. 400. All the laws of the United States not locally inapplicable were extended by special enactment to California a few weeks after she had been admitted as a state. Id. 521. Of this treaty Mr. Justice Wayne said, "By the ratification of this treaty California became a part of the United States." Cross v. Harrison, 16 How. 197, 14 L. Ed. 903. But, as will be shown, it is probable that Justice Wayne was referring to the relations of California and the United States as regards other nations, and not as to its internal, organic connection with the sovereign nation, so that these words cannot be taken as determining that supplementary legislation is not necessary to complete incorporation. In the cession of Alaska it was provided that the inhabitants who remained three years, with the exception of uncivilized native tribes, "shall be admitted to the enjoyment of all the rights, advantages and immunities of citizens of the United States." Article 3 (15 Stat. 542). About a year later congress extended our customs and navigation laws to the new territory. 15 Stat. 240. Thus we see that in all previous cession of territory there has been a special provision in the treaty for incorporating the inhabitants within the United States. Whether a treaty stipulation alone would be sufficient to incorporate the territory into the Union is not clearly established. The statement of Chief Justice Marshall, supra, would lead to the conclusion that such stipulation is sufficient to secure citizenship. Congress, however, has always deemed it necessary to put our customs laws in force by supplementary legislation. This uniform course of treaty and legislative provisions shows that the incorporation of new territory into our body politic is not to be readily inferred from a treaty, but results only from express stipulations in or necessary implication therefrom. Before the date of this importation the island had been ceded to this country by the treaty of Paris, which went into effect on April 11, 1899. Article 2 of that treaty provided that "Spain cedes to the United States the Island of Porto Rico." Article 9 provided that the "civil rights and political status of the native inhabitants of the territories hereby ceded shall be determined by the congress." 30 Stat. 1754. The treaty further provided that "Spanish subjects, natives of the peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty," may declare their intention to retain their allegiance, "in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside." Article 9 (30 Stat. 1759). There is no stipulation for the incorporation of the inhabitants within the Union, as there has always been in prior

treaties. On the contrary, their "civil rights and political status * * * shall be determined by the congress." Spaniards who renounce their allegiance have the same status as natives. In the determination of "civil rights and political status" must be comprehended the determination of the internal relationship of the Porto Ricans to our organic law. Before cession, under conquest, Porto Rico was a part of the United States as to foreign nations. The de facto title to the soil was in the United States, but its inhabitants were foreigners to the constitution, and the provision for uniformity of duties had no application there. Fleming v. Page, supra. By cession the title became de jure, but in the status of the islanders as foreigners, and so in the status of Porto Rico as a foreign country, no change was to be made until congress should determine its character. The treaty vests the sovereignty over the island in the United States, but postpones changes in the relations of its people, and in its relations to the body politic, until congress shall determine what relations shall be best suited to the conditions of its inhabitants and to the welfare of the United States. Since congress at the time of this importation had not performed this condition of incorporation, the status of Porto Rico, except as to other nations, remains unchanged.

Counsel for the appellants, however, interpret the treaty as having effected a complete incorporation of Porto Rico with the United States. They reject the provision which leaves the civil rights and political status of the inhabitants to be determined by congress as an unlawful attempt to grant to congress certain powers over the territory after it has become incorporated in our Union, and therefore as immaterial and ineffectual for any purpose. Taking the phrase, "Spain cedes Porto Rico to the United States," as making Porto Rico part of the United States under the constitution, they contend that the provision that "the civil rights and political status of the inhabitants shall be determined by congress" is either an attempt to grant congress unconstitutional rights, or "is merely harmless and superfluous, as it certainly is so far as political status is concerned, for it only declares what would be the law without it."

The treaty is a contract between two nations, and, under familiar rules, it must, if possible, be so construed as to give full force and effect to all its parts. "It is a rule in construing treaties as well as laws, to give sensible meaning to all their provisions, if that be practicable. 'The interpretation, therefore,' says Vattel, 'which would render a treaty null and inefficient, cannot be admitted;' and, again, it ought to be interpreted in such a manner as that it may have its effect, and not prove vain and nugatory." Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642. The construction contended for by the appellants not only fails to give sensible meaning to all the provisions of the treaty, but does violence to the natural and ordinary meaning of its language. When one nation "cedes" territory to another, it hands over the title and sovereignty, good as against all the world. But this does not necessarily determine in what way it shall be held by the new sovereign. As was said by Chief Justice Marshall in Insurance Co. v. Canter, 1 Pet. 541, 7 L. Ed. 254:

"The usage of the world is, if a nation be not entirely subdued, to consider the holding of acquired territory as a mere military occupation until its fate shall be determined at the treaty of peace. If it be ceded by the treaty the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master shall impose."

In determining the meaning to be attributed to the words "cede" and "foreign" herein, we must not confuse the principles of international and constitutional law. From the standpoint of international law, as regards other nations Porto Rico is annexed to the Union, and has become fully a part of the United States. The title to the soil is in us as exclusively as is that to any portion of this continent. Its political status is determined by the treaty. It is now a part of our dominion, undistinguishable from any other part of the United States, so far as other powers are concerned. But this international relation does not affect the status of the island from the standpoint of constitutional law. The soil became part of the United States by conquest. The treaty of cession only confirmed on the part of Spain a title already good against all the rest of the world. We have the authority of Fleming v. Page that acquiring the title to soil, making it part of the United States as regards foreign nations, does not bring it within the sphere of the constitution. If, then, it is not acquisition of soil which extends our constitutional boundaries, what does accomplish this result? In order to extend boundaries recognized by other nations, the extension of dominion by conquest is sufficient. To extend constitutional boundaries, there must be some extension of organic law to the inhabitants, or of institutions over the territory. The sphere of application of the constitution is determined, not by considerations of title to land, but by recognition of the status of its inhabitants. New territory is not brought under the constitution by acquisition of the soil; otherwise, Fleming v. Page could not have been decided as it was. This is done either by an incorporation of the inhabitants into the Union, or by an extension of our laws and institutions throughout the territory. This cannot be done by conquest, but only by legislation or treaty. Fleming v. Page. Here the treaty recognizes and makes complete the de facto title gained by conquest. The island is not thus brought under the constitution unless the treaty supplements the confirmation of title by an incorporation of the inhabitants into the Union under the constitution, or by the extension of our institutions. This the treaty fails to do. Instead of providing that Spanish residents who renounce their allegiance shall be incorporated as citizens,—the uniform course pursued hitherto when it has been desired to bring new territory into the Union,—the treaty stipulates that, in default of a declaration of allegiance to Spain, "they shall be held to have renounced it, and to have adopted the nationality of the territory in which they may reside." Thus they and the native inhabitants, practically the whole people of the island, are left to find a determination of their status in congressional action. The people of Porto Rico, instead of being incorporated into the Union by the treaty, are left in statu quo. Nor has there been any extension of our laws or institutions to the island. But at least one of these acts, brought about either by treaty or legislation, is necessary before any

change of status, before any application of the constitution, in Porto Rico. Until then the island remains, to use the language of the supreme court, "part of the United States, but still a foreign country."

It is strongly urged, by way of objection to effectuating the language and real intent of the treaty, that the United States has no constitutional authority to hold sovereignty over subject territory which it does not make part of itself under the constitution. This principle is attempted to be deduced, not from any general impossibility of owning territory without incorporating it as a part of the sovereign nation, but from the peculiar limitations claimed to exist upon our own sovereignty. Other nations rule and exercise full sovereignty over lands which they in no way annex to themselves as an integral part under their organic law. If the United States is to be denied this common attribute of sovereignty, it must be admitted that the treaty of Paris is so far forth unconstitutional. But, if our nation has this power in common with other nations, then the treaty is valid. We have seen that, before the treaty of Paris, Porto Rico was a foreign country, and that by the treaty of Paris its political status was to remain unchanged until congress should act. Until congress fixes its status otherwise, Porto Rico, so far as regards our constitution, is a foreign country. That it was so at the time of the treaty cannot be denied without running counter to the authority of the decision of the supreme court in Fleming v. Page, supra. That the treaty, if valid, left the constitutional status of the island unchanged, cannot be denied without doing violence to the meaning of its express terms, and adopting a construction which fails to give effect to all parts of the instrument.

The only remaining ground upon which it can be urged that Porto Rico's status has been changed is that the treaty is unconstitutional. Thus far in the history of our country no treaty has ever been adjudged invalid on this ground. A treaty is not only the law of our land, but also a contract of the United States with another nation. A court would not be justified in overruling the act of the treaty-making power unless the reasons for so doing were strong and imperative. The sole constitutional question is this: May our government by treaty accept the title and sovereignty over territory, and at the same time preserve its status as a foreign country, so far as its internal relation to us is concerned? Can we, in other words, hold sovereignty over territory without incorporating it into the United States? Counsel for appellant, in arguing that Porto Rico is a portion of this nation, rely chiefly on the case of Cross v. Harrison, 16 How. 164, 14 L. Ed. 889. They claim that it was there decided "not only that territory ceded by a treaty of peace becomes a part of the nation to which it is annexed, but that it ceases to be a foreign country, within the meaning of the tariff act, so that duties accrue under such an act upon goods brought into it from abroad." It is extremely doubtful whether any such doctrine can be deduced from that case. If it were to be assumed that such might be the effect of an unqualified cession, this principle would not apply in testing the constitutionality of a treaty which modifies the cession, and preserves the status of ceded territory as foreign. The contract between the United States and Spain in ex-

press' terms qualifies what the appellants claim is the usual legal effect of cession. The opinion in Cross v. Harrison does not contain any discussion of this, the only question before us. Indeed, the constitutional questions which were discussed were not involved in the decision, because the only controversy was as to the authority of the military governor, after cession, to collect the regular duties in force throughout the United States without authority from congress, and congress had ratified his action. This alone would have been decisive. Beyond this, the only question involved in the discussion was the right of the collector under the military governor, during the interregnum, to levy on goods coming into the ceded territory the same duties as were enforced elsewhere in the United States. In what sense California was a part of the United States is not made clear. Justice Wayne indeed said:

"By the ratification of treaty, California became part of the United States. And as there is nothing stipulated in the treaty with respect to commerce, it became instantly bound and privileged by the laws which congress had passed to raise a revenue from duties on imports and tonnage." Cross v. Harrison.

But the suit related to the claims of foreign importers; the right claimed by them was to land goods free from duty in territory under the sovereignty of the United States, and so a part of the United States as to all foreigners; no question of the internal relation of California and the United States was raised; and it is not at all certain that these words of Justice Wayne do not mean simply that, as to foreign nations, California had become a part of the United States by perfected title, and therefore foreigners could not violate there the law allowing them liberty to trade with the United States under specified conditions. But, even if these words of the court were intended to describe the internal relation of the new territory, they were used in reference to the treaty by which California was ceded. That treaty not only did not negatively qualify the cession, but, on the contrary, contained such phrases as these: "Territories previously belonging to Mexico and which remain for the future within the limits of the United States as defined by the present treaty." Article 7. "In consideration of the extension acquired by the boundaries of the United States as defined in the 5th article of this treaty" (article 12), and "considering that a great part of the territories which by the present treaty are to be comprehended for the future within the limits of the United States" (article 11),—besides the general provision for the incorporation of inhabitants as citizens already mentioned (article 9, 9 Stat. 930). Apparently the intent of that treaty was to include California within the United States. Whatever is said in Cross v. Harrison on the relation of the ceded territory to the United States, so far as it is not merely obiter, serves simply to fix the effect of that and similar treaties of cession. But there is nothing in all this from which we can derive any authority to declare unconstitutional a treaty of cession which postpones the incorporation of the ceded territory as an integral part of the United States. The only phrase at all bearing on that issue is, "Inasmuch as there is nothing stipulated in the treaty with respect to commerce, it became instantly bound and privileged by existing tariff laws." This indicates that a treaty may make

provisions for tariff regulations not uniform with those existing throughout the Union, thus postponing the complete annexation of the territory under the uniformity clause in the constitution. Cross v. Harrison, therefore, upon the authority of which the appellants chiefly rely, does not bear at all upon the constitutionality of this treaty. The discussion of the constitutional question simply assumes that California had become part of the United States. The references to and interpretations of said decision in subsequent decisions of the supreme court show that the only point decided there was, as stated by Mr. Justice Bradley, "that the president, as commander in chief, had power to form a temporary civil government for California, as a conquered territory, and to impose duties on imports and tonnage for the support of the government and for aiding to sustain the burdens of war, which were held valid until congress saw fit to supersede them; and an action brought to recover back duties paid under such regulation was adjudged to be not maintainable." Hamilton v. Dillin, 21 Wall. 87, 22 L. Ed. 531. "It was held in the case of Cross v. Harrison that the sovereignty of California was in the United States, in virtue of the constitution, by which power had been given to congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States,"—to show power of congress to govern it. Catron, J., in Scott v. Sandford, 19 How. 523, 15 L. Ed. 691.

The other case emphasized by appellants as bearing on this point is Loughborough v. Blake, 5 Wheat. 319, 5 L. Ed. 98. Reliance is placed on the following language of Chief Justice Marshall:

"It will not be contended that the modification of the power extends to places to which the power itself does not extend. The power, then, to levy and collect duties, imposts, and excises may be exercised, and must be exercised, throughout the United States. Does this term [i. e. the "United States"] designate the whole or any portion of the American empire? Certainly this question can admit of but one answer. It is the name given to our great republic, which is composed of states and territories. The District of Columbia or the territory west of the Missouri is not less within the United States than Maryland or Pennsylvania; and it is not less necessary, on the principles of the constitution, that uniformity in the imposition of imposts, duties, and excises should be observed in the one than in the other. Since, then, the power to lay and collect taxes, which includes direct taxes, is obviously co-extensive with the power to lay and collect duties, imposts, and excises, and since the latter extends throughout the United States, it follows that the power to impose direct taxes also extends throughout the United States."

Inasmuch as the District of Columbia was carved out of states which were under the constitution, it has been strongly urged that these statements are mere dicta. Mr. Justice Marshall's proposition is that, since the power to levy taxes may and must be exercised throughout the United States, the limitation of the power must cover an equal area. But in no event could it be necessarily decisive as to whether we can hold the title to territory without making it a part of the United States.

No other decision of the supreme court has been cited as furnishing any authority to support the claim that this treaty is unconstitutional. The question is therefore an open one. On the one side it is contended that the United States may hold title to territory without incorporating it fully under its organic laws; on the other, that when it accepts

103 F.—6

sovereignty the ceded territory at that instant becomes fully a part of the United States, without possible qualification or limitation. If the character of the acquisition may be limited, the attempt to preserve the foreign status of the island until congress shall determine the extent to which it is to be incorporated is constitutional. If cession, ipso facto, accomplishes an unqualified incorporation, Porto Rico is no longer foreign. If we cannot hold ceded territory without bringing it under the constitution, as an integral part of the United States, then we cannot give to Porto Rico practical independence,—a constitution and laws of her own, taxes of her own,—and hold merely the sovereignty, confined, perhaps, to control of foreign relations. If Porto Rico is still a foreign country, we might adopt that course. The treaty, if valid, leaves such a policy open to us. If it is a part of the United States, in the sense that appellants urge, we cannot grant independence unless we entirely renounce our sovereignty; for otherwise, under their contention, the island would be under the uniformity clause of the constitution, and we should be compelled to tax it uniformly with our own nation. Such a view of our constitutional limitations would make it impossible for us to accept from another nation a cession of territory on the condition that we should not tax it for a number of years. If cession works incorporation, and its effect cannot be limited, we cannot stipulate to hold the ceded territory without imposing upon it at once the burden of our excise laws, and our tariff. Can we not, in acquiring territory, provide for free trade with its former sovereign for a time? Counsel for appellants contend that we cannot, and that such a provision would be unconstitutional. If this contention is well founded, if such territory is at once necessarily incorporated, then the stipulation in the treaty of Paris that the Philippines are to have free trade with Spain for 10 years is void, because in violation of the uniformity clause in the constitution. Then the treaty which ceded Louisiana was unconstitutional, as some of its opponents urged at the time, in its attempt to limit the incorporation of that territory to the extent of admitting to its ports certain Spanish and French ships on payment of smaller tonnage duties than would be required in other ports of the United States. Here, to this extent, Louisiana was kept apart from full union with our nation, that in this respect it was not bound by the uniformity clause in the constitution. A similar provision secured privileges for Spanish ships for 12 years in the ports of Florida when that territory was ceded, thereby granting that territory commercial advantages not in harmony with a full incorporation under the constitution. Are we to declare these treaties unconstitutional? Are we to say that the United States, as a sovereign nation, exercising full power to make war and treaties, is to be so limited that it cannot accept sovereignty without unconditional incorporation? This is what we must decide if we are to declare the treaty before us unconstitutional. If the treaties with France and Spain, sanctioned in the former by congressional resolution unquestioned in our courts and acquiesced in all these years, are valid precedents; if the treaty of Paris, giving Spain free trade with the Philippines, is constitutional,—then the treaty clause in question is not unconstitutional and void, and Porto Rico

is still, in its constitutional relations to us, a foreign country, until congress shall otherwise determine. It may be argued, however, that, as the treaty-making power has not stipulated as to rates of duty for the ceded territory, this power is not included in the subjects left to congressional discretion. But it is difficult to conceive any general language more apt to express an intention to leave to congress the determination of all such matters, than that used in the treaty. Porto Rico was a foreign country, and its inhabitants were foreigners, prior to the treaty. The treaty virtually provided either that the status of the island as a foreign country should continue, or that the status of its inhabitants as foreigners should continue, until the essentials of a change of condition should be determined by congress. No suggestion has been made as to how the treaty can have changed the status of the island as a foreign country, when it expressly provides that the inhabitants shall retain their foreign status. If this treaty must be so construed that the territory is incorporated into the United States, while the inhabitants are denied the political status and civil rights of citizens, the treaty must be declared unconstitutional, and in that case Porto Rico remains a foreign country, and the duties were properly assessed. But such a construction is not to be adopted if the language used will reasonably admit of any other interpretation. The natural and apparent meaning of the language of the treaty is that the territory is acquired, but not incorporated, and that it therefore remains foreign, with respect to customs duties, until further legislation. This is in accordance with the provisions of prior treaties. Therefore the uniformity clause of the constitution does not yet apply.

It has been assumed throughout this discussion that if Porto Rico was a foreign country, in the sense that the constitutional provision for uniform duties does not apply to it, it was a foreign country within the meaning of the tariff law. The term "foreign" is used in various senses. Thus, the different states are usually held to be foreign to each other, except as concerns international relations. Sister state judgments are for most purposes foreign judgments, and generally, for all purposes other than those specifically mentioned in the constitution, our states are foreign to each other. On the same principle Porto Rico remains foreign to the United States, except as provided by the treaty. As it has not yet been domesticated under the constitution, its status continues unchanged, except as to its relations with outside nations. While the term "foreign countries," as used in our tariff law, has not yet been judicially passed upon, it may fairly be presumed that, if the makers of that law could have foreseen the present conditions, they would have intended that the former relations of Porto Rico to the United States, as regards customs duties, should continue until changed by act of congress. The power to hold territory without incorporating it as an integral part under its organic law is an ordinary attribute of sovereignty. The independent states possessed it before the formation of the Union. This attribute of sovereignty they delegated to the federal government in the treaty and war making powers, and denied to themselves, in express terms. As was said by Mr. Justice Bradley in the Legal-Tender Cases, 12 Wall. 554, 20 L. Ed. 313:

"The constitution of the United States established a government, and not a league, compact, or partnership. It was constituted by the people. It is called a 'government.' In the eighth section of aricle 1 it is declared that congress shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or office thereof. As a government, it was invested with all the attributes of sovereignty. * * * The United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality. It is invested with power over all the foreign relations of the country,—war, peace, and negotiations and intercourse with other nations,—all which are forbidden to the state governments. * * * Such being the character of the general government, it seems to be a self-evident proposition that it is invested with all those inherent and implied powers which at the time of adopting the constitution were generally considered to belong to every government as such, and as being essential to the exercise of its functions. If this proposition be not true, it certainly is true that the government of the United States has express authority, in the clause last quoted, to make all such laws (usually regarded as inherent and implied) as may be necessary and proper for carrying on the government as constituted, and vindicating its authority and existence."

And again, in Mormon Church v. U. S., 136 U. S. 42, 34 L. Ed. 491:

"The power to make acquisitions of territory by conquest, by treaty, and by cession is an incident of national sovereignty. The territory of Louisiana, when acquired from France, and the territories west of the Rocky Mountains, when acquired from Mexico, became the absolute property and domain of the United States, subject to such conditions as the government in its diplomatic negotiations had seen fit to accept relating to the rights of the people then inhabiting those territories."

The power exercised in this treaty, then, as an ordinary attribute of sovereignty, was granted by the states to the nation which was to represent them as independent in foreign affairs. Opposed to this view is the contention that, while the power to hold subject territory is an attribute of most sovereigns, it is not one of a republic. This argument is not drawn from a historic discussion of the question of the exercise of such power by republics (a ground from which it might, perhaps, be answered), but on the general principle that a government based upon the consent of the governed has the right to govern citizens, but no right to rule subjects; that the very purpose of such a government is to secure political and civil liberty, not to deny it. Conceding the full force of this contention, does it bear on the question? Even if we grant that our republic must insure throughout all territory under its dominion a republican form of government, does this prevent our holding territory without incorporating it into the United States? Cannot such territory, which is not given the political status of membership in our Union, be governed on purely republican principles? Could not its inhabitants have the same civil and political rights as those of the existing territories? It is answered that there would be no guaranty of these rights if this territory is not annexed to the United States under the constitution. But, even if the express guaranties did not apply, would those rights be of necessity entirely unprotected? The argument starts from the position that a republic cannot be allowed to govern without any restraint. In this very principle we may find the safeguard of such territory. If the United States tried to govern any territory in violation of the spirit pervading republican institutions, such action might be held illegal by courts

on the basis of this principle. It may be admitted that the constitutional guaranties of civil rights would apply to territory under the sovereignty, but not a part, of the United States. Certain civil rights which we believe belong to every one, are crystallized into the negative provisions of our constitution, in order to prevent any wrongful and improper use of our power, and these may well be held to control our power wherever it reaches. These considerations may be found to limit us in governing any territory. Whether they do or not, it is not necessary here to decide. If they do, it will be because we cannot violate the principles of government imbedded in our institutions, not because Porto Rico is a part of the American nation. It will be for the reason thus stated by Mr. Justice Bradley in Mormon Church v. U. S., supra:

"Doubtless congress, in legislating for the territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the constitution, from which congress derives all its powers, than by any express and direct application of its provisions."

The treaty cannot be considered unconstitutional, therefore, on the ground that we have no right to govern territory without any restraint, and perhaps cannot violate anywhere the negative provisions of the constitution against infringement upon ordinary civil rights. If the treaty-making power acquires territory, and congress wishes to hold and govern it in accord with constitutional principles, yet without bringing it into membership in the Union and without subjecting it to our national taxation, there seems no valid constitutional reason why this cannot be done. It may be best for us not to make its citizens fully our citizens. It may be more just towards it not to subject it to paying its share of taxation. In the case of Porto Rico, with her tobacco and rum industries, such share would probably be out of all proportion to that paid by other districts. Unless we tax her for national purposes, there is no just claim on her part for the protection of the constitutional provision for uniform taxation. If we consider it for our and her best interest to keep her apart from the land which must bear the burden of taxation, why should we not have the power to do so? It may be the only just course to pursue. Thus wisest statesmanship and highest consideration for the rights of people under our charge may influence us to refrain from making ceded territory part of our nation. Twice before in our history have we found it necessary to qualify and postpone complete incorporation into the Union. It would be a narrow construction of the constitution which in such a case would find in some "underlying principles" a veto upon an attempt to act for the highest interest of our nation and the people intrusted to its care. The question to be decided is, not what is expedient, not what the people of the United States may desire, not what is the duty of congress, not a matter of individual preference. It is a question purely of constitutional law. That we have the power to govern without the obligation of uniform taxation may be an unfamiliar proposition, but it is so because we have never before had occasion to use the power to the same extent. The constitution makers may not have thought of it, yet, as we have seen, it is

an incident of full sovereignty commonly exercised at the time the Union was formed,—one which is now prohibited to the states, and so must have passed to the federal government with the power to make war and treaties, to which it is incident; for the framers of the constitution intended that instrument, not as a limitation upon the freedom of the new sovereign in acting for the states in foreign affairs, not as a check to growth, but as the organic law of a nation that can live and grow. To deny this power to govern territory at arm's length would be to thwart that intention to make the United States an unfettered sovereign in foreign affairs; for, if we wage war successfully, we must some time become, as many think we are now, charged with territory which it would be the greatest folly to incorporate at once into our Union, making our laws its laws, its citizens our citizens, our taxes its taxes, and which, on the other hand, international considerations and the sense of our responsibility to its inhabitants may forbid us to abandon. The construction of the constitution which would limit our sovereign power would force us into a dilemma between violating our duty to other nations and to the people under our care, on the one hand, and violating our duty to ourselves, on the other. That construction would in such case imperil the honorable existence of our republic. It could not have been intended by those who framed our constitution that we should be born a cripple among the nations.

There has been found, then, no reason, either on principle or authority, why the United States should not accept sovereignty over territory without admitting it as an integral part of the Union, or making it bear the burden of the taxation uniform throughout our nation. To deny this power is to deny to this nation an important attribute of sovereignty. The intent of the constitution is to make the federal government a full sovereign, with powers equal to those of other nations in its dealings for the states in foreign affairs. If the United States has this power,—and we have found no reason to deny it,—the treaty of Paris is constitutional. It is unnecessary to determine what limitations may control us in governing such territory. It is sufficient that we have the power to govern it without subjecting it to the burden of our national taxation. There is, then, no ground for declaring unconstitutional the treaty of cession, which accepts sovereignty on the condition that the status of the ceded territory as foreign country shall be preserved as it was until congress shall determine it. The treaty of Paris, then, is valid. It left the political status of the inhabitants of Porto Rico unchanged. Their status at the time of cession was, as declared by the supreme court, that of inhabitants of a foreign country, as regards the constitution of the United States, and within the meaning of the tariff acts. The treaty of cession did not change that status. And, as congress had not acted at the time of this importation, Porto Rico was still a foreign country, in the sense of the tariff law, and duties were lawfully assessed on the articles imported therefrom. The decision of the board of general appraisers is affirmed.