# REPUBLIC AVIATION CORPORATION et al. v. LOWE et al.

District Court, S. D. New York.

Nov. 19, 1946.

John P. Smith, of New York City (Albert P. Thill, of New York City, of counsel), for plaintiffs.

John F. X. McGohey, U. S. Atty. for Southern District of New York, of New York City (John F. Ryan, Asst. U.S. Atty., Ward E. Boote, Chief Counsel, U. S. Employees' Compensation Commission, Herbert P. Miller, Asst. Chief Counsel, U. S. Employees' Compensation Commission, all of New York City, of counsel), for defendant Samuel S. Lowe.

Arthur P. West, of New York City, Atty. for defendant Aida M. Parker.

LEIBELL, District Judge.

The plaintiffs have instituted this action under § 21(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 921(b), and § 3(b) of the Act relating to compensation for disability or death to persons employed at military, air, and naval bases outside the United States, 42 U.S.C.A. § 1653(b). The relief sought is a permanent injunction suspending and setting aside a compensation order which made an award that the employer, Republic Aviation Corporation, and the insurance carrier, Liberty Mutual Insurance Company, shall pay to Aida M. Parker, the claimant, certain death benefits by reason of the death of her husband, Joseph F. B. Parker.

The facts as to Parker's employment and death are set forth in the Findings of Fact made by the Deputy Commissioner, Samuel S. Lowe, as follows: "That on the 20th day of August, 1945, deceased above named was in the employ of the employer above named at Ia Shima, an island in the Pacific Ocean, which is in the Foreign Compensation District, established under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, as extended by the Act of August 1st, 1941 as amended (42 U.S.C. 1651 [42 U.S.C.A. § 1651]) to employees of contractors with the United States and others, employed outside the United States, and that the liability of the employer for compensation under said Act was insured by Liberty Mutual Insurance Company; that the employer herein is a manufacturer of aircraft and on August 20, 1945 was rendering service to the United States Army at Ia Shima, under the terms of an existing contract between the said employer and the War Department of the United States Government; that by the terms of the said contract the employer herein agreed to furnish technical representatives and test pilots to the United States Government for 'supervision of instruction in and assistance with the assembly operation, servicing, repair and alteration of aircraft and the parts thereof manufactured or designed by the contractor' (employer) * * * 'overseas at any place or places where and when said services are necessary to the interest of the Government'; that the said contract was a fixed price contract between the United States and the contractor above named for the purpose of engaging in public works within the purview of section 1(a) (4) of such Act of August 16, 1941, as amended; that on said day, deceased herein was performing service for the employer under the said contract at Ia Shima, an island in the Pacific Ocean, formerly a Japanese possession, but acquired by the United States by conquest prior to August 20, 1945; that while taking off from the said island in a fighter plane on the said day for the purpose of testing the range of flight of the said plane, the plane crashed in consequence of which deceased was killed; * * *". (A copy of the findings and award are annexed to the complaint herein.)

The defendants have made a motion for summary judgment. The motion is based upon the complaint, the award, the transcript of the testimony taken at the hearing before the Deputy Commissioner and the exhibits received at said hearing (the contract and amendments thereto pursuant to which the Republic Aviation Corporation agreed to furnish technicians and test pilots, of whom Parker was one). All parties to the action have stated that no issue of fact is presented by this motion, only a question of law as to whether Parker's employment was under a contract which was included within the coverage of the Defense Bases Compensation Act, as amended December 2, 1942.

The Defense Bases Compensation Act as originally enacted August 16, 1941, Chap.

357, § 1, 55 Stat. 622, 42 U.S.C.A. § 1651 et seq., provided:

### "An Act

"To provide compensation for disability or death resulting from injury to persons employed at military, air, and naval bases acquired by the United States from foreign countries, and on lands occupied or used by the United States for military or naval purposes outside the continental limits of the United States, including Alaska, Guantanamo, and the Philippine Islands, but excluding the Canal Zone, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That except as herein modified, the provisions of the Act entitled 'Longshoremen's and Harbor Workers' Compensation Act', approved March 4, 1927 (44 Stat. 1424), as amended, and as the same may be amended hereafter, shall apply in respect to the injury or death of any employee engaged in any employment at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government or any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States, including Alaska, Guantanamo, and the Philippine Islands, but excluding the Canal Zone, irrespective of the place where the injury or death occurs."

It appears that the Defense Bases Act as first enacted in August 1941 was for the purpose of meeting the situation presented when this government acquired certain military bases on long term lease from Great Britain. In a letter to Congress requesting the legislation Secretary of War Stimson referred to "construction projects in foreign bases * * * where workmen's compensation insurance is necessary". After this country became involved in the World War on December 8, 1941 our Defense Bases were multiplied and extended all over the globe and the nature of the work became more varied. Makeshift arrangements with contractors as to a voluntary workmen's compensation proved unsatisfactory and it was decided to increase the scope and coverage of the Defense Bases Act. After hearings before the committees of Congress the Act was amended December 2, 1942.

The December 1942 amendment, Chap. 668, Title III, § 301, 56 Stat. 1035, 42 U.S. C.A. § 1651 provided:

"§ 1651. Compensation authorized— Places of employment

"(a) Except as herein modified, the provisions of sections 901-921 and 922-950 of Title 33, as amended, shall apply in respect to the injury or death of any employee engaged in any employment—

"(1) at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government; or

"(2) upon any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States (including Alaska; the Philippine Islands; the United States Naval Operating Base, Guantanamo Bay, Cuba; and the Canal Zone); or

"(3) upon any public work in any Territory or possession outside the continental United States (including Alaska; the Philippine Islands; the United States Naval Operating Base, Guantanamo Bay, Cuba; and the Canal Zone), if such employee is engaged in employment at such place under the contract of a contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) with the United States; but nothing in this paragraph shall be construed to apply to any employee of such a contractor or subcontractor who is engaged exclusively in furnishing materials or supplies under his contract;

"(4) under a contract entered into with the United States or any executive department, independent establishment, or agency thereof (including any corporate instrumentality of the United States), or any subcontract, or subordinate contract with respect to such contract, where such contract is to be performed outside the continental United States and at places not within the areas described in subparagraphs (1), (2), and (3) of this subdivision, for the purpose of engaging in public work, and every such contract shall contain provisions

requiring that the contractor (and subcontractor or subordinate contractor with respect to such contract) (1) shall, before commencing performance of such contract, provide for securing to or on behalf of employees engaged in such public work under such contract the payment of compensation and other benefits under the provisions of sections 1651—1654 of this title, and (2) shall maintain in full force and effect during the term of such contract, subcontract, or subordinate contract, or while employees are engaged in work performed thereunder, the said security for the payment of such compensation and benefits, but nothing in this paragraph shall be construed to apply to any employee of such contractor or subcontractor who is engaged exclusively in furnishing materials or supplies under his contract;

"irrespective of the place where the injury or death occurs, and shall include any injury or death occurring to any such employee during transportation to or from his place of employment, where the employer or the United States provides the transportation or the cost thereof.

### "Definition of public work

"(b)  As used in this section, the term 'public work' means any fixed improvement or any project involving construction, alteration, removal, or repair for public use of the United States or its Allies, including but not limited to projects in connection with the war effort, dredging, harbor improvements, dams, roadways, and housing, as well as preparatory and ancillary work in connection therewith at the site or on the project."

The issue presented by this motion may be briefly stated.  The defendants argue that the Act as amended was intended to cover "every activity outside of the continental United States in connection with the war effort" as Major Burton testified at the hearings on the Bill before the Senate Committee on April 2, 1942.  As the Government's brief puts it, "The whole legislative effort was directed toward furnishing complete coverage and protection for project employees sent outside the United States on whatever war-service job their contractor employers were engaged upon,— just so long as it did not involve only the furnishing of materials or supplies.  The law was intended to protect project employees, regardless of the nature of the project, so long as it was connected with the war effort."

The position of the plaintiffs is stated in their main brief as follows: "It is respectfully submitted, however, if such was the purpose and intent of the legislators, they could have very simply said so.  But the fact is they didn't say so; instead they included the above lengthy, precise, particularized definition of the type of public work the legislation was intended to cover.  By specifying that the work covered must involve a fixed improvement or construction, alteration, removal or repair in connection with the war effort, they designated the type of work in connection with the war effort to be included.  Therefore, any work not within the specific or similar classifications enumerated in the definition was excluded therefrom.  Again, by specifying in the definition of public work dredging, harbor improvements, dams, roadways and housing as well as work ancillary and preparatory to the enumerated projects, the Legislature indicated the species of work and workmen to be covered by the legislation.  The services of a test pilot was not one of the species of work set forth in the statutory definition."

At the hearing on the claim the Deputy Commissioner discussed the circumstances that led to the enactment of the original Defense Bases Act August 16, 1941 and to its amendment December 2, 1942.  He then gave the Administrative interpretation of the Act and its application to the claim of Parker's widow, as follows:

"This Commission believes that both by Congressional intent and by the language employed in Public Law 784\*, the instant

---

* Public Law 784 is entitled "An Act To provide benefits for the injury, disability, death, or enemy detention of employees of contractors with the United States, and for other purposes".  It is Chap. 668, 56 Stat. 1028, enacted December 2, 1942 and contains three Titles.  The amendment to the Defense Bases Act is in Title III.

case is within the scope of the Act and particularly within the scope of Sub-division 4 which relates to public work, of Section 301 of that Act. Needless to say, thousands of claims for compensation and death benefits have been adjudicated informally or formally by the Commission since the law became effective. In considering these claims, and in approving policies of compensation insurance procured by contractors with the United States for work on connection with the prosecution of the war effort outside the United States, the War and Navy Departments and this Commission have been called upon to interpret the language of Title 3 of Public Law 784 and the interpretation which has been given to Sub-divisions 3 and 4 of Section 301 by the United States Employees' Compensation Commission, I now quote:

"The administrative interpretation by the United States Employees' Compensation Commission of the definition of the term 'public work' appearing in section 1(b) of the Defense Bases Act (Act of August 16, 1941, as amended) is that such definition embraces three general work categories or situations which are

"(1) employments related to fixed improvements or related to any projects involving construction, alteration, removal, or repair for public use of the United States or its allies,

"(2) employments related (a) to any projects in connection with the war effort, and (b) any projects which fall specifically within such categories as dredging, harbor improvements, dams, roadways, and housing,

"(3) employments related to preparatory and ancillary work in connection with work under any of the foregoing (fixed improvements or other projects), at the site or on the project.

"Such administrative interpretation views the definition of 'public work' as containing three independent clauses, respectively spelling out the three separate work situations as specified under (a), (b) and (c) above. The first statutory meaning is contained in the first or principal clause, (1) above; the succeeding meanings, (2) and (3) above, being contained in coordinate clauses, each independent of the principal clause in meaning. Such two succeeding meanings are introduced by terms of inclusion; namely, by the work 'including' as to one of them, and the phrase 'as well as' as to the other. Each of the two meanings, beyond such first clause, is an equal part of the whole definition.

"Under such administrative interpretation of the definition, such elements as 'construction, alteration, removal, or repair', are not required in respect to situations falling under (2) and (3) above, and that if they should be required they would nullify parts of the definition. Such interpretation gives recognition and force to the meaning of the term 'project', standing by itself, which meaning is not limited to fixed improvements or to operations involving the elements above mentioned.

"Such administrative interpretation also views employments under service contracts as within the contemplation of that separate part of the definition of 'public work' which specifies 'projects in connection with the war effort',—this, of course, assuming the existence of a contract with the United States and the work thereunder being in fact related to the war effort.

"That is the Commission's interpretation of the language employed in Sub-division 4, Title 3, Section 301, and is the Commission's answer to the employer's contention of the applicability of Public Law 784 and the lack of jurisdiction of this Commission."

The insurance carrier, at the hearing before the Deputy Commissioner, offered in evidence a service contract between the War Department and Republic Aviation Corporation dated October 29, 1943, which was amended and supplemented and its time period extended by several supplemental contracts, the last of which was made July 24, 1945.

The whereas clauses of the October 29, 1943 contract stated:

"Whereas, the Contractor, under the provisions of Contract No. W 535 ac-31327 (hereinafter sometimes referred to as the 'prior contract') has supplied certain air-

craft technicians to the Government for assignment overseas, and

"Whereas, the period of performance stated in said prior contract has expired, and

"Whereas, at the request of the Government for its best interests in the prosecution of the War certain of such aircraft technicians have not been returned to the plant of the Contractor in the United States but have remained at a site or sites overseas to perform services in anticipation of this contract; and

"Whereas, the parties hereto desire to utilize said aircraft technicians so remaining overseas as technical representatives to perform services under this contract; and

"Whereas, the Government desires to obtain the services of additional technical representatives for services overseas and the Contractor is willing to supply the same; and

"Whereas, it is in the interest of the Government in the prosecution of the War to contract at this time for the services called for hereunder."

A supplemental agreement, May 9, 1944, called for the "services of Three Test Pilots Overseas" and contained the following Whereas clauses:

"Whereas, under Contract No. W 33-038 ac-602, entered into between the parties hereto, which contract as the same may have heretofore been amended, modified and supplemented, is hereinafter referred to as the "Service Contract', the Contractor has supplied the services of certain technical representatives for assignment overseas; and

"Whereas, it is in the interest of the Government in the prosecution of the war to contract at this time for the service of Three (3) additional representatives qualified as test pilots; and

"Whereas, in anticipation of the execution of this Supplemental Agreement, the Contractor has provided the services of such additional representatives."

The period of performance was extended to July 24, 1945 by supplemental agreement of October 28, 1944 and to August 31, 1945 by a so-called Change Order of July 24, 1945.

The director of field service of Republic Aviation testified that at the time of Parker's death on August 20, 1945, he was a test pilot working for the Field Service Department, and that on August 4, 1945, Parker has been transferred from the Flight Operations Department to the Overseas Service Department to go to the Far East Air Forces to handle a specific problem. He left the corporation at Farmingdale, L. I., to proceed to the Pacific War Theatre on August 4, 1945 and went to Ia Shima from the west coast by military transport. He was one of the test pilots referred to in the supplemental agreement of May 9, 1944. Parker was assigned to the Commanding Officer of the Far West Air Force. He was taking off on a P-47 to make a long range fuel consumption test, when he crashed and met his death. He lost his life while performing work under the contract of Republic Aviation with the United States.

Liberty Mutual wrote the employer's liability insurance policy under Republic's contract with the War Department. The policy was furnished in Republic's compliance with the provisions of the Defense Bases Act.

Lieut. Col. William E. Pullen of the Finance Department, A. U. S., testified before the Deputy Commissioner that the Republic Aviation contract came within the scope of Public Law 784 and that "It was the administrative determination of the War Department that contracts with the United States wherein the work was to be performed outside the United States and such work was in the prosecution of the war, then such contracts were within the contemplation of Public Law 784, and were insured accordingly."

Lieut. Commander Joseph A. Edwards, of the Insurance Section of the Office of Assistant Secretary of the Navy, testified that the Navy as well as the Army required contractors with the United States, engaged in work in connection with the war effort outside the United States, to cover their employees with insurance policies under the Workmen's Compensation Act and that within the last fifteen months (he testified November 28, 1945) there was a specific form of contract for technical services out-

side the limits of the United States and that protection for services thus rendered such insurance policies were required. Prior to the adoption of the standard form of contract, each case was handled individually and in each instance insurance under the contract was required. The policy of insurance furnished Republic Aviation by Liberty Mutual is not before this court; nor is the contract or arrangement by which Parker was hired by Republic to perform services under Republic's contract with the United States. But that there was a policy of insurance and that it was intended to protect Republic under the latter's contract with the United States in compliance with the Defense Bases Act may properly be assumed from the arguments of counsel and the record before the Deputy Commissioner, and from the allegations of the complaint herein.

The attorney for the individual defendant, Aida M. Parker, contends that the decedent's employment could be classed under subdivision (a) (1) which covers "Any employee engaged in any employment—(1) at any military, air, or naval base acquired after January 1, 1940, by the United States from any foreign government"; that Ia Shima was a military air base acquired from Japan by conquest after January 1, 1940 (about June 1945); that the statute is not limited to bases acquired by cession but includes bases acquired by conquest; that there could be no good reason for including the one and excluding the other. If Parker had been rendering his services under the contract in question at one of the military air bases acquired from Great Britain in exchange for the 50 destroyers, he clearly would have been covered by subdivision (a) (1). The plaintiffs argue that Congress had in mind the bases acquired from Great Britain when the statute was first enacted August 16, 1941. But these were not the only bases the United States acquired from foreign powers by treaty after January 1, 1940. We were in the war almost a year when the Act was amended in December 1942. Bases were acquired from other foreign powers also; from Brazil (Ascension Island) and from Ecuador (Galapagos Islands) in 1942.

Territory of a foreign government may be acquired by cession or by conquest. Hackworth's "Digest of International Law" (1940) Vol. 1, defines acquisition by cession and acquisition by conquest.

"Cession of territory involves the transfer of sovereignty by means of an agreement between the ceding and the acquiring states". p. 421.

"Conquest is the taking of possession of territory of an enemy state by force; it becomes a mode of acquisition of territory —and hence of transfer of sovereignty— only if the conquered territory is effectively reduced to possession and annexed by the conquering state". p. 427.

In the case of Fleming v. Page, 9 How. 603, 614, 50 U.S. 603, 614, 13 L.Ed. 276, involving the legality of duties levied upon the cargo of a schooner which sailed from Tampico, Mexico, to the United States while Tampico was in the possession of the United States and governed by its military authorities as a result of the Mexican War, Chief Justice Taney delivered the opinion of the Court, from which the following is quoted:

"A war, therefore, declared by Congress, can never be presumed to be waged for the purpose of conquest or the acquisition of territory; nor does the law declaring the war imply an authority to the President to enlarge the limits of the United States by subjugating the enemy's country. The United States, it is true, may extend its boundaries by conquest or treaty, and may demand the cession of territory as the condition of peace, in order to indemnify its citizens for the injuries they have suffered, or to reimburse the government for the expenses of the war. But this can be done only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the President by the declaration of war. * * *

It is true, that, when Tampico had been captured, and the State of Tamaulipas subjugated, other nations were bound to regard the country, while our possession continued, as the territory of the United States, and to respect it as such. * * * As regarded all other nations it was a part of the

United States, and belonged to them as exclusively as the territory included in our established boundaries.

But yet it was not a part of this Union. For every nation which acquires territory by treaty or conquest holds it according to its own institutions and laws. And the relation in which the Port of Tampico stood to the United States while it was occupied by their arms did not depend upon the laws of nations, but upon our own Constitution and acts of Congress."

The court concluded that Tampico was a foreign port and that cargoes shipped from Tampico were subject to our revenue laws and were liable to the duty charged upon them.

If we give to the words "acquired * * * from any foreign government" the meaning which they would have in international law, the United States had not "acquired" Ia Shima from Japan by conquest because Ia Shima had not been formally annexed to the United States. It was occupied by the military forces of the United States. If the word "acquire" is given its ordinary meaning—to gain, to come into the possession of—then Ia Shima was a military air base acquired from a foreign government. In which sense did Congress use the word "acquire", considering the situation that existed when the Defense Bases Act was enacted? The United States was not then at war. Defense Bases had been acquired from Great Britain by treaty or agreement. I do not believe that Congress contemplated at that time the acquisition of defense bases by conquest.

■■ Plaintiffs argue that the type of project in connection with the war effort, intended to be covered by the statute, was a work project involving some form of construction, alteration, removal or repair, such as the work specified in § 1651(b), construction work that contributed to the building of the defense base, and that the service contract of Republic did not come within the statutory definition of "public work". But in that definition are expressly included "projects in connection with the war effort". That is a very broad term and should be liberally construed in line with the public policy of protection for the employees, a policy embodied in the Longshoremen's and Harbor Workers' Compensation Act (South Chicago Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732) which was extended to projects in connection with the war effort by the Defense Bases Act. The project on which Parker was engaged was a design or plan in connection with the war effort. The Congress defined "public work" in this statute and the courts should follow that definition. Fox v. Standard Oil Co., 294 U.S. 87 at page 96, 55 S.Ct. 333, 79 L.Ed. 780.

The Circuit Court of Appeals, First Circuit, discussed the purposes of the Defense Bases Act as originally passed, August 16, 1941, in the case of Royal Indemnity Co. v. Puerto Rico Cement Corp., 142 F.2d 237, at page 239, as follows: "The history of the Defense Bases Act clearly shows the intention of Congress to extend the provisions of the Longshoremen's Act to defense bases without regard to local compensation laws. It was stated in House Report No. 1070, 77th Congress, First Session, that the purpose of the bill was to provide substantially the same relief to outlying territories, including and mentioning Puerto Rico, as the existing law affords employees in the United States, and to assist contractors employing labor at such bases to obtain compensation insurance at reasonable rates."

■■ The weight to be given to administrative interpretation of the Defense Bases Act should be the same as that which the Courts are required to give to administrative interpretations of the Longshoremen's and Harbor Workers' Compensation Act. In Norton, Deputy Comm. v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 750, 88 L.Ed. 931, the Court held that the judicial review permitted to the courts under § 21 (b) "Does not give authority to the courts to set aside awards because they are deemed to be against the weight of the evidence. More is required. The error must be one of law, such as the misconstruction of a term of the Act."

In Davis v. Department of Labor, 317 U. S. 249, 63 S.Ct. 225, 229, 87 L.Ed. 246, the Court held that the conclusions of the administrative agency "That a case falls

within the federal jurisdiction is therefore entitled to great weight and will be rejected only in cases of apparent error".

I have concluded that the interpretation given to the Defense Bases Act by the Deputy Commissioner who heard the Parker claim was correct; that Parker was covered by the Act at the time of his death; and that the award of the Deputy Commissioner was in accordance with law. It follows therefore that the defendants' motion for summary judgment dismissing the complaint herein on the merits should be granted. Settle order accordingly.