UNIVERSITY OF ROCHESTER,
Petitioner,

v.

Ralph M. HARTMAN, Director, Office of Workers' Compensation Programs, United States Department of Labor; Helen S. Vishniac; Ethan Vishniac; and Ephriam Vishniac, Respondents.

NATIONAL AERONAUTICS & SPACE ADMINISTRATION and National Science Foundation, Petitioners,

v.

Ralph M. HARTMAN, Director, Office of Workers' Compensation Programs, United States Department of Labor; Helen S. Vishniac; Ethan Vishniac; and Ephriam Vishniac, Respondents.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

UNIVERSITY OF ROCHESTER,
Respondent.

Nos. 135, 136 and 296, Dockets 78–4093, 78–4106 and 79–4098.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1979.

Decided Feb. 20, 1980.

Eugene D. Ulterino, Rochester, N. Y. (Nixon, Hargrave, Devans & Doyle, David A. Stern, Buffalo, N. Y., of counsel), for petitioner, University of Rochester.

Joshua T. Gillelan, II, Atty., U. S. Dept. of Labor, Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Washington, D. C., of counsel), for the Director, Office of Workers' Compensation Programs, respondent.

David D. MacKnight, Rochester, N. Y. (Lacy, Katzen, Jones & Ryen, Rochester, N. Y., of counsel), for respondents Helen S. Vishniac, Ethan Vishniac and Ephriam Vishniac.

Freddi Lipstein, Atty., Dept. of Justice, Washington, D. C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., William Kanter, Atty. App. Staff, Civil Div., Washington, D. C., of counsel), for petitioners National Aeronautics and Space Administration and National Science Foundation.

Sheldon Elliot Steinbach, American Council on Ed., Washington, D. C., for amicus curiae, American Council on Ed., The Association of American Universities and the National Ass'n of College and University Business Officers.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

MOORE, Circuit Judge:

Over six years ago Professor Wolf V. Vishniac suffered a fatal fall in the Dry Valleys of Antarctica while conducting research. At the time of his death Professor Vishniac was a tenured faculty member at the University of Rochester (University), and a recognized expert in microbiology. He began receiving support for his basic research into the microbial ecology of planetary soils from the National Aeronautical and Space Administration (NASA) in 1961. NASA continued to fund his research up until the time of his death.

In furtherance of his microbiological research, Professor Vishniac made a trip to Antarctica from December, 1971 to January, 1972. On that occasion it was unnecessary for him to apply for a formal leave from the University since his absence was so brief. On December 5, 1972 he advised Dr. Paul Gross, the President of the University, that he was in the process of applying to the National Science Foundation (NSF) as well as to NASA for grants to support a return trip to Antarctica of somewhat longer duration during the 1973–1974 austral summer, but he assured Dr. Gross that he would continue to teach at the University both in the Spring and Fall semesters. As to finances he said: "The support from the National Science Foundation and from NASA will cover transportation, logistic support, and research costs. Neither grant will pay salary". (App. 326).

The purpose of Professor Vishniac's field trip to Antarctica was to conduct a series of experiments designed to detect the existence of micro-organisms in the soil. The nature of Professor Vishniac's intended work during his Antarctica expedition was best described by his colleague at the University, Professor Walter P. Hempfling. Professor Hempfling testified that Professor Vishniac did not accept the view of other scientists that the Dry Valleys of Antarctica were sterile

"because he felt that the methods which they employed to attempt to isolate viable micro-organisms from those areas were inappropriate. He went to Antarctica both the first and second time, in order to apply a much wider and more imaginative variety of procedures for the detection of micro-organisms in those soils." (App. 66).

Some of the preliminary chemical and microbiological analysis of the soil samples Professor Vishniac collected was to be done at the camp in Antarctica, but "the bulk of the work was meant to be done at the University of Rochester". (App. 69).

On September 11, 1973, NSF executed a grant of funds to Professor Vishniac to cover the costs of transportation to Antarctica and for logistical support while there. NASA also awarded Professor Vishniac funds to defray the costs of his expedition in the form of a supplemental grant containing the standard condition that the University contribute some 8% of the total project cost. Professor Vishniac left for Antarctica in November, 1973 and died in the Dry Valleys on December 10, 1973 while collecting soil samples for his planned experiments.

As a professor at the University, Professor Vishniac was covered by the Workmen's Compensation Statute of the State of New York, and in due course his widow began to receive benefits pursuant to the provisions of that Statute. (App. 42). In February, 1974, the Department of Labor's local Office of Workmen's Compensation Programs (Office) notified the University that Profes-

sor Vishniac's death might be within the scope of the federal Defense Base Act, 42 U.S.C. § 1651 *et seq.* (DBA). After reviewing the terms of that Act, the University informed the Office in July, 1974 that it did not believe the DBA covered Professor Vishniac's death. Nevertheless, in November, 1974 Professor Vishniac's wife and two minor children filed a claim for benefits with the Office invoking the benefits of DBA.

A public hearing was set, and NASA, NSF, and the American Council on Education were granted permission to intervene as parties in interest. The hearing was held in May, 1976 before an Administrative Law Judge (ALJ) in Rochester, New York. In September, 1976 the ALJ issued an order denying the claim made pursuant to the DBA on the ground that at the time of his death Professor Vishniac was not engaged in "public work" within the meaning of the DBA. The claimants appealed to the Department of Labor's Benefits Review Board (Board), which rendered a decision in April, 1978 reversing the ALJ. Pursuant to § 21 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 921, the University, NASA, NSF, and the American Council on Education are here appealing the Board's decision.

The DBA was originally enacted in August, 1941. By that date World War II was well underway, and the United States had contracted to build military bases in various foreign lands. The employees of many American contractors were engaged in work at such bases, and the DBA extended the coverage of the Longshoremen's and Harbor Workers' Compensation Act to include them. Such overseas work dramatically increased after December 8, 1941, when the United States entered into the conflict with Japan. Many projects related to national defense, but not located at military bases, were begun, with the result that the persons employed by the contractors of those projects lacked equitable workmen's compensation protection. Congress responded by amending the DBA in December, 1942 to include all employees engaged in public work outside the continental United States. The purpose of the amendment is aptly set forth in a letter from the United States Employees' Compensation Commission to the Chairman of the House Committee on the Judiciary:

"The proposed legislation is designed to extend workmen's compensation benefits for the protection of employees outside of the United States who are working for Government contractors at the defense bases obtained from foreign countries, and upon lands and premises used for military and naval purposes located in the Territories and at other places, in cases of injury or death resulting from war hazards as defined in the measure, and in cases where such employees are detained by an enemy as prisoner, hostage, or otherwise, leaving dependents to be provided for." *Hearings Before Subcommittee No. 1 Of The Committee On The Judiciary, House of Representatives on S. 2412*, 77th Cong., 2d Sess. 62 (1942).

*See generally* [1942] U.S.Code Cong.Serv. pp. 1744–51.

All the parties agree § 1651(a)(4) of the DBA controls the validity of the claim in this case. Section 1651(a)(4) reads:

"(a) Except as herein modified, the provisions of the Longshoremen's and Harbor Workers' Compensation Act, as amended, shall apply in respect to the injury or death of any employee engaged in any employment . . .

(4) under a contract entered into with the United States or any executive department, independent establishment, or agency thereof, . . . or any subcontract, . . . where such contract is to be performed outside the continental United States . . . for the purpose of engaging in public work." 42 U.S.C. § 1651(a)(4).

The term "contract" is not defined in the DBA, but the term "public work" is:

"(1) the term 'public work' means any fixed improvement or any project, whether or not fixed, involving construction, alteration, removal or repair for the public use of the United States or its allies,

including but not limited to projects or operations under service contracts and projects in connection with the national defense or with war activities, dredging, harbor improvements, dams, roadways, and housing, as well as preparatory and ancillary work in connection therewith at the site or on the project." 42 U.S.C. § 1651(b)(1).

The ALJ looked to the historical context of the DBA and found "it is beyond dispute that the Act was intended and designed for the protection of the civilian work force engaged in defense related employments outside the continental United States." (App. 43). His examination of the Act, its amendments, and the pertinent case law left him with "no doubt that the hallmark of 'public work' under the Act is a relationship to defense or military or war activities". (App. 44). He concluded: "To equate Professor Vishniac's scholarly research with military endeavor unduly strains the facts and the law". *Id.* His holding that Professor Vishniac was not engaged in public work at the time of his death obviated the need to rule on the question of whether the NASA and NSF grants constituted "contracts" within the meaning of DBA.

The Review Board, in reversing the ALJ, did not agree that a defense or military purpose is a prerequisite to coverage by the DBA, reading the phrases "projects or operations under service contracts" and "projects in connection with the national defense or war activities" as referring to two independent kinds of projects. (App. 22). The Board also thought it unnecessary for Professor Vishniac to have been engaged in any "fixed improvement" or "construction, alteration, removal or repair." (App. 27). The Board went on to conclude that NASA's grant to Professor Vishniac actually constituted a contract since all the necessary elements of "an offer, acceptance,

at least one promise, sufficient consideration, and a capacity to contract" were present and satisfied. (App. 29). The Board then summarily concluded that since the NASA grant was a contract, it was a contract within the meaning of § 1651(a)(4) and furthermore a service contract within the meaning of § 1651(b)(1). (App. 31).

■ The Board's conclusion that service contracts need have no connection with national defense or war activities, or with construction, to be covered by the DBA is inaccurate. As we read the DBA, § 1651(a)(4) applies only when a benefit claim stems from a contract with the United States to perform "public work" overseas, "public work" constituting a construction project, work connected with national defense, or employment under a service contract supporting either activity. Therefore, to be covered, a service contract must be connected either with a construction project or with a national defense activity. Service contracts lacking a construction or national defense nexus simply fall beyond the boundaries of the DBA.

■ This view of the statute is compelled by a holistic reading of the DBA's history and the handful of case opinions it has precipitated. The legislative history of the DBA reveals it has grown from a limited response to the overseas military demands of World War II to an Act covering all overseas United States government-related construction projects, national defense activities, and service contracts thereto. The Act was originally intended to cover civilians employed at overseas military bases, was later extended to cover civilians working on overseas construction projects for the United States government or its allies, and was finally extended to protect employees fulfilling service contracts tied to such a construction project or to a national defense activity.[1] The *sine qua non* of the Act's

1. The DBA was originally enacted in 1941 to provide the same workmen's compensation coverage for employees of government contractors at military bases leased abroad as comparable employees received within the United States. *See* S.Rep.No.540, 77th Cong., 1st

Sess. (1941); H.R.Rep.No.1070, 77th Cong., 1st Sess. (1941). As World War II escalated, civilian contractors expanded their operations into areas beyond leased bases, and consequently were forced to negotiate increasingly generous compensation schemes in order to attract quali-

applicability has always been a military or a United States government construction connection. There is no reason to suppose that a service contract is exempt from this prerequisite nexus. The handful of cases interpreting the DBA and its amendments all support the position that a claim must have a defense or construction project nexus, and none stands for the proposition that no such connection is necessary.[2] Viewing the facts of the instant case from this perspective, it is patent that Professor Vishniac's fatal trip to Antarctica was not a part of any government related construction project, national defense activity,[3] or service contract related thereto.

The instant benefit compensation claim must also be denied for the reason that a research grant does not constitute a "con-

tract" within the meaning of the DBA. It would unduly distort the facts to find that Professor Vishniac was an employee of an employer under a contract to be performed outside the continental United States. Professor Vishniac was a professor of biology at the University, and his home base was Rochester, New York. He merely received grants—in conjunction with the University—to support a field trip to Antarctica to gather soil samples. Aside from some experimental analysis in the field, he intended to complete the bulk of his research in his laboratory at the University.[4] It would be an absurdity to characterize him as an employee of a contractor engaged in public work outside the United States.

Furthermore, there are crucial differences between a grant to support the pur-

fied workers. See S.Rep.No.1886, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Admin.News, pp. 3321, 3322–23. The result was a patchwork of uneconomic and discriminatory private compensation schemes, and Congress remedied the situation in 1942 by amending the DBA to cover all employees of government contractors engaged in work outside the United States.

In 1953 Congress amended the DBA to change the frame of reference from World War II to one of national defense in order to extend coverage to overseas government construction projects conducted during periods when there was no declared state of war. H.R.Rep.No.490, 83rd Cong., 1st Sess., *reprinted in* [1953] U.S. Code & Admin.News, pp. 1783, 1784. In 1958 Congress converted the DBA from temporary to permanent legislation after determining that the United States' overseas commitments would not diminish substantially in the foreseeable future. See S.Rep.No.1886, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Admin.News, pp. 3321, 3324. This set of amendments also defined the term "public work" to include service contracts. See 42 U.S.C. § 1651(b).

**2.** See: *Republic Aviation Corp. v. Lowe*, 69 F.Supp. 472 (S.D.N.Y.1946), *aff'd on other grounds*, 164 F.2d 18 (2d Cir. 1949); *Flying Tiger Lines Inc. v. Landy*, 250 F.Supp. 282 (N.D.Cal.1965), 370 F.2d 46 (9th Cir. 1966); *Employers' Mutual Liability Insurance Co. of Wisconsin v. McLellan*, 304 F.Supp. 321 (S.D. N.Y.1969); *Alaska Airlines, Inc. v. O'Leary*, 216 F.Supp. 540 (W.D.Wash.1963), *vacated on other grounds*, 336 F.2d 668 (9th Cir. 1964); and *Berven v. Fluor Corp.*, 171 F.Supp. 89 (S.D.N.Y. 1959).

**3.** There is no basis for the claimant's argument that Professor Vishniac's basic research into soil microbiology was connected with our national defense. Qualified witnesses testified at the administrative hearing that Professor Vishniac's research was completely unrelated to the Defense Department and lacked any potential military use. (App. 70, 104). Indeed, the United States' presence in Antarctica is limited to purely scientific research pursuant to the terms of the Multilateral Antarctic Treaty, 12 U.S.T. 794, TIAS No. 4780, and for the United States to conduct any activities there related to war or national defense would constitute a violation of that Treaty.

**4.** Professor Vishniac's experiments included the implantation of sterile glass microscope slides, nylon tape, and electron microscope grids in the soil of the Dry Valleys. (App. 67–68). The slides were to be left implanted in the soil for several weeks, and then removed, stained with an appropriate agent, and microscopically examined to determine if micro-colonies had adhered to them. (App. 69). Another set of experiments were designed to determine whether organisms were actively metabolizing in the Antarctic soil by saturating small areas of the soil with barium hydroxide saturated pads. (App. 68). Finally, Professor Vishniac planned to imbed small glass tubes (some of which contained an organ nutrient) in the soil to encourage the growth of organisms in the tubes. (App. 68). The results of all these experiments were to be subjected to exhaustive microscopic and laboratory analysis, some of which was to be done *in situ* at Antarctica, but most of which was to be done in Professor Vishniac's laboratory at the University. (App. 69–70).

suit of pure research and a contract to perform specified services. Congress first drew a legal distinction between grants and contracts in the Grants Act of 1958, 42 U.S.C. §§ 1891–93. Congress there determined that many types of research activities are supported more appropriately by grants than by contracts. Thus, in order to promote scientific research, Congress empowered all agencies with the authority to contract for research to issue grants for research as well. See H.R.Rep.No.2640, 85th Cong., 2d Sess. (1958), U.S.Code Cong. & Admin.News, p. 5337. The Grants Act of 1958 was repealed and subsumed by the Federal Grant and Cooperative Agreement Act of 1977, 41 U.S.C. § 501 et seq., which was enacted to clarify the distinction between grants and contracts. That Act set forth the following criteria for differentiating between federal grants and federal contracts:

## USE OF CONTRACTS

"Each executive agency shall use a type of procurement contract as the legal instrument reflecting a relationship between the Federal Government and a State or local government or other recipient—

(1) whenever the principal purpose of the instrument is the acquisition, by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government; or

(2) whenever an executive agency determines in a specific instance that the use of a type of procurement contract is appropriate."

## USE OF GRANT AGREEMENTS

"Each executive agency shall use a type of grant agreement as the legal instrument reflecting a relationship between the Federal Government and a State or local government or other recipient whenever—

(1) the principal purpose of the relationship is the transfer of money, property, services, or anything of value to the State or local government or other recipi-

ent in order to accomplish a public purpose of support or stimulation authorized by Federal statute, rather than acquisition, by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government; and

(2) no substantial involvement is anticipated between the executive agency, acting for the Federal Government, and the State or local government or other recipient during performance of the contemplated activity." 41 U.S.C. §§ 503, 504. NASA and NSF have also developed criteria for determining whether a particular project is better suited for a grant or a contract. For grants the criteria are:

(A) The agency's primary purpose is to aid or support the acquisition of knowledge.

(B) The work is such that its exact course, outcome or timetable for achieving the outcome cannot be defined.

(C) The proposed investigation is such that the grantee will bear primary responsibility and will exercise judgment and original thought to achieve the scientific goals.

(D) Long term support is required for the project.

(E) Technical reports will be submitted only as new discoveries are made and not at predetermined intervals.

(F) The proposal for the project is unsolicited.

A contract instrument is more appropriate where:

(1) The agency's primary purpose is to procure well-defined research in direct support of a programmed mission or project.

(2) The work is directed toward a solution of a specific problem.

(3) A specific service or piece of hardware is the end product.

(4) The agency will exercise control of the objectives, specifications, methods, costs, and timetable of the project.

(5) The end result is clearly defined or the parameters of the project are prepared in advance.

(6) A significant portion of total effort will involve the development, fabrication or acquisition of instruments or hardware and this portion will be subcontracted.

(7) The proposal is solicited.

(App. 83–85, 97–98, 114–22, 233–34, 241–74). That Congress, NASA, and NSF intended to establish a legal difference between grants and contracts is evident from the care with which they have set forth criteria for distinguishing between them. It is also significant that neither NASA or NSF has ever provided for DBA coverage in a grant document. (App. 79, 116). Indeed, a member of the Commission on Government Procurement testified that a survey of all grant instruments used by the federal government revealed not one instance where provision for DBA coverage was incorporated into a grant agreement. (App. 116, 118–20). Such a longstanding, universal practice among federal agencies can only be based on the commonsensical conclusion that a research grant does not rise to the level of a contract within the meaning of the DBA.[5]

Applying the criteria established by Congress, NASA, and NSF to Professor Vishniac's Antarctica project, it is obvious that a grant instrument was the only appropriate vehicle for its funding. Professor Vishniac's proposal was not solicited by the Government, nor did the Government retain close control over the objectives, methods, or timetable of the project. The purpose of the project was to supplement Professor Vishniac's long-term basic research into an area of pure science rather than to produce a clearly defined object or service ordered by the Government to solve a specific problem. The direction of the project was entirely controlled by Professor Vishniac's scientific judgment, and he was not required to submit any final report to the Government until he had completed his basic research.

In summary, we hold that to be compensable under the DBA, a benefit claim must stem from a contract with the United States to perform public work overseas, public work constituting government-related construction projects, work connected with the national defense, or employment under a service contract supporting either activity. This case does not involve a contract to perform such public work outside the continental United States. Rather it involves a professor who in furtherance of his ongoing basic scientific research received grants to support a brief expedition to Antarctica in order to obtain soil samples for later analysis in his laboratory back at his University home base. There is no contract within the purview of the DBA, and no activity related to a government construction project or the national defense. The Benefit Review Board erred in its construction of what constitutes "public work" and a "contract" in the context of 42 U.S.C. § 1651 *et seq.* We reverse its order awarding compensation, and dismiss the claimant's benefit claim.

OAKES, Circuit Judge, concurring:

I concur in that part of the majority opinion finding that "public work," as defined under the DBA, must have either a defense or construction nexus. But, since that part of the opinion relating to whether a grant may be a contract is wholly unnecessary to the result here, I decline to join in it.

---

5. This plain reading of the DBA is reinforced by a February 20, 1969 advisory opinion rendered by the Department of Labor's Bureau of Employees' Compensation. Responding to a query whether an individual conducting research in Antarctica under a NSF grant was covered by the DBA, the Bureau gave the following advisory opinion: "[S]cientific grants of the type described in your letter and in the material received from the National Science Foundation, are not contracts within the meaning of and subject to the provisions of the Defense Base Act; that in no realistic sense can it be said that the Government makes these payments in consideration for the provisions of goods and/or services". (App. 34–35).